[S. F. No. 15607.   In Bank.—July 1, 1937.]

In the Matter of the Estate of ERNEST C. DUNCAN, Deceased.   EMMA C. DUNCAN, Appellant, v. LUCY N. DUNCAN, Individually and as Administratrix, etc., Respondent.

A. Don Duncan for Appellant.

Walter H. Linforth and Wm. M. Cannon for Respondent.

CURTIS, J.—Appellant, hereinafter referred to as contestant, filed four notices of appeal from various orders and decrees made and entered during the probate of the estate of Ernest C. Duncan, deceased. These appeals involve the question of the correctness of the decree of final distribution by which the whole estate was distributed to the respondent, the surviving wife of said deceased, as community property, and objections to the final account of the administratrix and to the supplemental account of the administratrix. The parties herein have heretofore been before this court on matters pertaining to the estate. (*Duncan* v. *Superior Court,* 3 Cal. (2d) 143 [44 Pac. (2d) 365].)

The decedent, Ernest C. Duncan, died intestate on January 11, 1933. His only heirs at law were his widow, Lucy Nicolai Duncan, who became the administratrix of his estate, and his mother, Emma C. Duncan, contestant herein. The bulk of his estate consisted of shares of common stock of Crown Cork & Seal Company. The estate was appraised at over $44,000. The surviving widow claimed the entire estate as community property. The contestant, his mother, claimed half of it, contending that it was all his separate property. On November 19, 1934, the court made its decree settling the final account. On April 23, 1935, the court made its decree settling the supplemental account of administratrix and ordering distribution of the entire estate to the surviving widow of said decedent as community property of herself and decedent. Contestant appeals.

Obviously the main question herein involved is the propriety of the decree of final distribution by which the whole estate of decedent was distributed to the surviving widow as community property. The decedent and respondent were married on September 8, 1914, and lived together as husband and wife until his death on January 11, 1933, a period of eighteen years and four months. If the whole estate was community property, it goes to the surviving widow. (Sec. 201, Probate Code.) If, however, any part of the estate was his separate property, that part goes (there being no issue, and decedent's father having predeceased him) one-half to the surviving widow and one-half to his mother, the contestant. (Sec. 223, Probate Code.)

Appellant contends that decedent before his marriage to respondent owned at least one-half of the stock of Western Stopper Company with the right to acquire the other half by paying to Jones, the owner of the other half of the stock, $500 per month out of the profits of the business until paid for, and that decedent used this original ownership of Western Stopper Company stock, as a nucleus which he expanded and which he developed until he owned all of the capital stock of The Western Stopper Company, a subsequently organized successor of Western Stopper Company, which stock ownership was transmuted into 2,500 shares of common stock of Crown Cork & Seal Company, of which 2,000 shares remained in his estate at the time of his death.

A brief synopsis of the various business transactions which resulted in the acquisition by decedent of 2,500 shares of Crown Cork & Seal Company stock will be helpful to an understanding of the claims of each of the parties.

In 1912, decedent was president and general manager of a corporation known as Western Stopper Company, which was engaged in the business of manufacturing crown corks or machine-crimped, tin bottle stoppers lined with a cork disc. Associated with him in this business was one G. H. Jones. All of the stock of the corporation stood in the name of the decedent. (It is the claim of contestant that decedent owned one-half of this stock which had been given to him by Jones for his knowledge and ability in the stopper business, and that upon the payment by him to Jones at the rate of $500 per month of the purchase price of the other half of the stock, he was to become the sole owner.) This company had been

partly financed by funds taken out of the Jones-Duncan Paint Company, another company of which decedent was manager, and in which he was also associated with Mr. Jones. It had also been partly financed by cash furnished by Jones and also by some money furnished by contestant. At the time decedent was married to respondent on September 8, 1914, he was receiving a salary from both of these companies. (There is some dispute as to whether his total salary for both positions was $300 per month, or $300 from the Jones-Duncan Paint Company and $350 from Western Stopper Company, but this is unimportant.)

In 1919, friction developed between Jones and the decedent, and Jones brought suit claiming that he owned all of the stock of Western Stopper Company and that decedent had no interest in any of the stock. A deal was worked out whereby a new corporation was organized to acquire all the assets of the old corporation and to wipe out entirely the old corporation. The name of the new corporation, which was incorporated in April, 1919, was The Western Stopper Company. The deal took the following form: The assets of the old Western Stopper Company were sold to one Benton W. Brown, a mere nominee of Jones, for $20,000. The assets were then sold by Benton W. Brown to the new corporation, The Western Stopper Company, for $70,000 which was paid to Mr. Jones. The suits were dismissed. It is conceded that decedent received no part of this purchase price. The $70,-000 was raised through cash contributions of $6,000 from Comyn, $6,000 from Mackall, $1500 from Fleishhacker, $1500 from Humphrey, and a loan of $55,000 from the Anglo London & Paris National Bank, procured through the endorsement by Comyn and Mackall of the note of the new corporation, The Western Stopper Company. Thus the new corporation, The Western Stopper Company, became the owner of all the assets of the old Western Stopper Company, and any claim of Jones was wholly wiped out. The mechanics of the organization of The Western Stopper Company, as indicated by the records of that company, were as follows: The corporation was organized in the office of William F. Humphrey, attorney at law. Five young men in his office were selected as the first board of directors of the organization. Later Comyn and Mackall, copartners, made an offer to purchase $99,500 of its capital stock out of a total authorized

capital of $100,000. According to the minutes of the organization, this offer was accepted. Thereafter Fleishhacker and Humphrey and Duncan acquired shares in the corporation. Comyn gave his promissory note to The Western Stopper Company for $24,000 for 300 shares; Mackall gave his promissory note for $24,000 for 300 shares; Fleishhacker gave his note for $8,500 for 100 shares, Humphrey gave his note for $8,000 for 100 shares, these amounts being the difference between the par value of the stock and the cash already paid in. (The discrepancy of $500 between the $8,000 note and the $1500 paid in by Humphrey on the purchase price of his shares which was $10,000, is possibly explained by a probable charge of $500 for legal services.) Decedent gave his promissory note for $20,000 for 200 shares. Eventually all of these notes were paid for out of dividends of the corporation. It was understood at the time of the organization of the new corporation that decedent should continue as manager. He was undoubtedly a business man of considerable ability and under his management the corporation prospered.

On April 11, 1924, by written agreement between decedent and Humphrey, Humphrey agreed to sell his 100 shares in the corporation to decedent for the total price of $19,000, consisting of a cash payment of $6,000, the payment of $5,000 on May 20, 1924, and the delivery by decedent on that date to Humphrey of his note of $8,000 to The Western Stopper Company which was still outstanding. This deal was carried out, and the stock was issued in decedent's name.

On April 23, 1924, decedent bought from Fleishhacker his 100 shares in the corporation which were reissued in decedent's name. Ten thousand five hundred dollars in cash was paid to Fleishhacker as the purchase price of the stock. It is conceded that to finance this deal decedent borrowed $10,500 from the Anglo Bank, executing two personal notes to the bank, one for $9,000 and one for $1500. In addition, Fleishhacker's note to The Western Stopper Company was canceled and decedent executed a new note to take its place. As security for the loan to the bank, decedent put up the 100 shares purchased from Fleishhacker. These notes were eventually paid off in installments until only $1500 remained payable on August 27, 1930.

On August 27, 1930, decedent bought from the Anglo Bank, which had become the owner of the 300 shares of stock thereto-

fore owned by Comyn and the 300 shares of stock theretofore owned by Mackall, the remaining 600 shares of The Western Stopper Company. Decedent gave his note to the bank for $81,500, which included the purchase price of the 600 shares for $80,000 and the unpaid note of $1500. This note given for the payment of $81,500 was a joint and several note which was signed by decedent's wife who thereby became personally responsible for its payment. There was put up with the bank as security for this note the 600 shares of The Western Stopper Company which were being purchased; also the shares already acquired by decedent consisting of his original 200 shares, and the 100 shares of Fleishhacker and the 100 shares of Humphrey; 232 shares of Nicolai Corporation, which was the separate property of decedent's wife; and a $40,000 life insurance policy issued on the life of decedent. In October, 1930, 2,500 shares of W. B. Crane & Co., Ltd., a corporation in which the decedent owned a considerable interest, were likewise deposited as security.

In July, 1931, a deal was made with the Crown Cork & Seal Company, whereby that company became owner of the assets of The Western Stopper Company through a subsidiary corporation organized for the sole purpose of taking over such assets, and decedent became the owner of 2,500 shares of Crown Cork & Seal Company. The transaction was substantially as follows: All of the assets of The Western Stopper Company was distributed to decedent and The Western Stopper Company was dissolved. Decedent then sold the assets to The Western Stopper Company, Inc., a new corporation which was wholly owned by the Crown Cork & Seal Company. Decedent received $191,290 as the purchase price. With $91,290, as part of the agreement, he purchased 2,500 shares of the common stock of Crown Cork & Seal Company, and with the $100,000 balance paid off the joint and several note to the Anglo Bank for $81,500. He also paid off two personal notes, one for $9,000 and one for $1,000 out of this sum. Certificates representing 1250 shares of Crown Cork & Seal Company were issued in his wife's name and 1250 shares were issued in his name.

The latter part of December, 1931, decedent sold the 2,500 shares, and repurchased them in the early part of 1932. In decedent's 1931 income tax report, a loss was established as the difference between the purchase price and the sale price

of these stocks. These repurchased shares were all issued in the name of the decedent. Upon the request of the bank, decedent had left with the bank as his security for a personal liability for the debts of The Western Stopper Company, Inc., 2,000 shares of the Crown Cork and Seal Company. He had given his wife 500 shares with instruction to put them in her safety deposit box. Thereafter, he asked his wife for those 500 shares and sold them. Upon the theory that decedent had merely borrowed the 500 shares theretofore given to her which he sold by reason of the fact that none of the 2,000 shares were available as they were pledged with the bank, and he was prevented by his death from returning the 500 shares to her, the respondent wife claimed 500 shares as her separate property out of the 2,000 shares held by the bank at the time of decedent's death, and returned only 1500 shares in the inventory as community property.

In explanation of the 2,500 shares of stock of W. B. Crane & Co., Ltd., it appears that in 1927, a partnership consisting of decedent and W. B. Crane was organized to which $500 in cash was contributed by W. B. Crane and $1750 was contributed by Duncan, for the purpose of selling bottling machinery and supplies. W. B. Crane was the salesman for the partnership which was an equal one. Later this partnership was incorporated and became W. B. Crane & Co., Ltd., the assets of the corporation being transferred to it and the stock being issued to the partners. Upon the dissolution of the corporation, decedent apparently had made no claim to any of its assets, nor made any attempt to collect the accounts receivable.

In addition to the foregoing, it should also perhaps be noted that on October 1, 1920, decedent's mother gave to decedent a check for $2,776, which was exactly one-half of the sum of $5,552 which she had received from the sale of a house and lot purchased by her in 1914 in San Francisco. She had made the down payment of $2,500, and thereafter the payments, interest, insurance, etc., had been kept up by decedent.

To complete the picture, it should be stated that at the time of decedent's marriage, his wife owned considerable property as her separate property from which she received dividends aggregating in some years several thousands of dollars. Thus she owned as her separate property 232 shares of Nicolai Door Manufacturing Company which had a book value of

$106 per share as well as several other smaller blocks of stock. While it appears from the record that in a few instances dividends from his separate stock were used by the decedent in his own affairs, and on one occasion the 232 shares of the Nicolai corporation were used by decedent as added security for a loan from the bank, and on another occasion shares of Pacific Gas and Electric stock and Spring Valley Water Company, owned as separate property by decedent's wife, were also put up by him as security for a loan, it is evident that the principal of her separate property was always preserved intact as her separate property.

Briefly stated, decedent's business life as reconstructed by contestant is as follows: Prior to his marriage, decedent had organized and developed a manufacturing business, known as Western Stopper Company, in conjunction with one Jones, and at the time of his marriage owned one-half of the capital stock of said business and had a right to buy the other half interest of his associate. In 1919, five years after his marriage, decedent had difficulties with his associate, Jones, the owner of the other half of the corporation, and decedent obtained new capital through the financial credit of new associates, W. Leslie Comyn and B. F. Mackall, to buy off the claims of his former associate, Jones. He and his new associates organized a new corporation to continue the business, in which corporation, The Western Stopper Company, decedent was given 200 shares of all of the capital stock in consideration of his interest in the old corporation and of his knowledge and ability and capacity to run the business, receiving in addition a large salary. Decedent used his interest in the first corporation and this initial 200 shares in The Western Stopper Company as a nucleus, and by obtaining credit on the basis of this separate property, subsequently acquired further shares in The Western Stopper Company as his separate property until he became the sole owner of the entire 1,000 shares of said corporation. Decedent in 1931 sold all the assets of The Western Stopper Company for $191,290 cash, of which $91,290 was immediately used to purchase 2,500 shares of the common stock of Crown Cork & Seal Company, 2,000 shares of which he owned at the time of his death and which comprised the bulk of his estate. Contestant claims that both spouses kept their property separate and that every act and conduct of the spouses for many years

indicated that said business and stock were always considered as the separate property of the decedent.

On the other hand, respondent reconstructs decedent's business life as follows: At the time of their marriage her husband was in debt and had no property except an inchoate interest in the stock of the Jones-Duncan Paint Company and Western Stopper Company, both of which were owned by Jones, and in which her husband had been promised an interest by Jones if the business was successful, but which interest, because of difficulties between her husband and Jones never materialized. In 1919, within five years after their marriage, both these corporations had gone out of business and their assets, including the good will and trade and corporate names, were sold for cash, no part of which was received by her husband, and at that time he, as he himself declared, was "cleaned out" and "broke". In April, 1919, her husband acquired 200 shares of stock in the new corporation, The Western Stopper Company, which had been organized and financed by Comyn and Mackall, men of considerable means, to purchase the assets of the defunct Western Stopper Company, in consideration of decedent's promissory note for $20,000 and his agreement to continue to employ, as active manager, his knowledge, capacity and ability in the business for the benefit of the newly organized corporation. Her husband subsequently acquired 800 more shares of the 1,000 shares of the corporation and these 1,000 shares acquired by him in the corporation were all acquired by the use of community funds and her separate funds. These 1,000 shares of The Western Stopper Company were transmuted into 2,500 shares of Crown Cork & Seal Company of which 1250 shares were issued in her name and 1250 shares in the name of her husband, which stock partook of the same character as the stock of The Western Stopper Company, having been bought with money received from the sale of the assets of said corporation. She asserts that during their marriage no property was received by her husband by gift, bequest, descent or devise. Respondent petitioned for distribution to her of the entire estate as community property. She makes no claim in said petition to any of the property as her separate property, and it is only necessary for us to determine therefore whether or not the finding of the trial court that no part

of the property of the decedent at the time of his death was his separate property is sustained by the evidence.

█ At the very outset, contestant was confronted in opposition to her claim by the well-established presumption that all property left by decedent, acquired after marriage, is presumed to be community property. This presumption is fundamental to the community property system. (3 Cal. Jur., Supp., p. 553.) This presumption has greater force in cases where the marriage has been a long-continued relation than in cases where the marriage was entered into shortly before the acquisition of the property. (*In re Caswell's Estate,* 105 Cal. App. 475 [288 Pac. 102] ; *Estate of Jolly,* 196 Cal. 547 [238 Pac. 353] ; *Estate of Bryant,* 3 Cal. (2d) 58 [43 Pac. (2d) 529].) █ The burden of producing clear and satisfactory proof that the property was the separate property of decedent was upon the contestant as the respondent was entitled to rely upon the presumption that it was community property. (*Estate of Jolly, supra,* p. 553; *Estate of Fellows,* 106 Cal. App. 681, 684 [289 Pac. 887] ; *Estate of Donohoe,* 128 Cal. App. 544 [17 Pac. (2d) 1010].) It is, of course, not necessary that the clear and satisfactory proof required should amount to a complete demonstration, for it has been held that to counterbalance the naked legal presumption only that degree of proof is necessary which ordinarily produces conviction in an unprejudiced mind. (*Freese* v. *Hibernia Sav. etc. Soc.,* 139 Cal. 392 [73 Pac. 172] ; *Simonton* v. *Los Angeles T. & S. Bank,* 205 Cal. 252 [270 Pac. 672].) In the instant case, as before noted, the trial court found in favor of the presumption thus holding in effect that the presumption had not been overcome by the evidence presented by the contestant. █ Upon this appeal, therefore, contestant is confronted with the added task of establishing the fact that there is no real conflict in the evidence and an entire failure of any substantial evidence to support the conclusion of the trial court, for, of course, the question of the sufficiency of the evidence is primarily a question for the trial court to determine, and if there be a conflict of the evidence, the finding of the lower court is not open to review on appeal.

█ It is apparent that the keystone to contestant's claim that the property of decedent was his separate property is the claimed nucleus of his interest in the old Western Stopper

Company, of which he was manager, and the transmutation of such interest into shares of the subsequently organized corporation, The Western Stopper Company, and the transmutation of this stock into shares of Crown Cork & Seal Company. Upon the failure of proof that such nucleus existed, the burden being upon the contestant to establish its existence, the whole argument of contestant collapses. The trial court found that, "at the time of said marriage said deceased had no property but hoped and expected later to acquire an interest in the stock of Western Stopper Company, a corporation, and Jones-Duncan Paint Company, a corporation; that all of the issued stock of Western Stopper Company at that time outstanding stood in the name of the deceased, but the same was held by him in trust for one Jones". It likewise found that when the entire assets of Western Stopper Company had been sold, no part of the purchase price had been received by the decedent. It likewise found that the 200 shares of The Western Stopper Company stock acquired by decedent in 1919 was not a gift to decedent but was received by decedent in consideration of the execution by him of his promissory note for $20,000 and his further agreement to accept the position as manager of the new corporation. It also found that, "In the year 1919 (which was the date of the incorporation of The Western Stopper Company), after the sale of the assets of said Western Stopper Company, said decedent had no property of any kind or character." This being so, there is no escape from the conclusion that if these particular findings be supported by evidence, none of the property of the decedent at the time of his death was his separate property. Counsel for both parties have with meticulous detail worked out the various business transactions of decedent over the years, striving to show by bank balances, income tax reports, and his personal ledger, the source of the funds from which decedent paid for various blocks of stock acquired at different times, each party attempting to prove her own theory of the source of the money so used, or the basis of the credit obtained by decedent. If, however, the court's findings be upheld with reference to the state of decedent's finances prior to his acquisition of his initial shares in The Western Stopper Company, and with reference to the fact that these initial 200 shares were acquired for a consideration and not as a gift, then the details of these business transactions become of

no importance. It necessarily follows that if ''decedent had no property of any kind or character'' at a time five years after his marriage and thereafter acquired no separate property by gift, bequest, descent or devise, all shares of stock subsequently acquired by him must be either community property of the spouses, or if any of said shares were bought with the separate funds of the wife, then partly the community property of the spouses and partly the separate property of the wife.

From a very careful examination of the record we are satisfied that the evidence justified these findings and that the judgment of the trial court must be affirmed. As a detailed discussion of the business of the decedent with reference to the business transactions subsequent to 1919, and the setting out in detail of the evidence, pro and con, to prove or disprove the different theories of the parties, would serve no good purpose, we shall confine our discussion to the all-important findings above set out, and the evidence relative to these findings.

Contestant concedes that aside from the interest of the decedent in the Jones-Duncan corporation and in the old Western Stopper Company, decedent owned no separate property at the time of his marriage to respondent. For this reason, the fact that the unsecured assessment roll of the city and county of San Francisco for the year 1915 showed the property owned by decedent did not exceed $300, that in the year 1920 and 1921, he was not assessed for any property whatever, and that during the years 1918, 1919, and 1920, his bank balance, with the exception of the deposit of the $2,776 check from his mother, showed a very small balance, and that he and another man had mortgaged two automobiles for the sum of $2,000 is of no particular importance. We are concerned only with decedent's interest in the two corporations, for it is this interest which contestant claims furnished the ''backlog'' from which decedent built up his considerable estate as separate property. With reference to this interest, respondent's wife testified that her husband claimed an interest in the corporation by virtue of Jones' promise to give him an interest if the project proved successful. The testimony of contestant and the testimony of a brother of decedent, who was a secretary of Jones-Duncan Paint Company, was to the effect that decedent actually

owned a one-half interest in Western Stopper Company and upon the purchase price of the other one-half interest being paid at the rate of $500 per month to Jones, he would become the owner of the other half. As a matter of fact, the contestant testified that decedent was to pay Jones $500 out of the profits for the rest of his life. It is at once apparent that there existed a conflict in the evidence which it was the duty of the trial court to resolve. In view of the fact that no claim was made that decedent had invested any money in the corporation but was contributing his knowledge and ability to the business, together with the fact that he was receiving a generous salary for his efforts, we cannot say that the trial court was not justified in its conclusion that decedent only owned an inchoate interest which never materialized. No documentary proof was offered with reference to decedent's interest in either the Jones-Duncan Paint Company or old Western Stopper Company. The widow claimed to have obtained her information from her husband. The brother claimed to have obtained his information from remembered conversations between decedent and Jones when he was present, but could not remember positively having seen any of the documents in connection with the ownership of the business. It was for the trial court to decide which of the two versions it would accept. The improbability of stock owned by Jones standing in decedent's name is overcome by the admitted fact that Jones was in financial difficulties and was using Benton W. Brown as a means of covering up his financial dealings.

The finding of the trial court with reference to the initial 200 shares of The Western Stopper Company stock negatives contestant's claim that decedent's interest in the old Western Stopper Company, whether actual or inchoate, was not entirely lost to him, but dwindled into a one-fifth interest in the business upon its reorganization with Comyn and Mackall. Contestant claims that the organization of the new corporation, The Western Stopper Company, was a joint venture of Comyn, Mackall and decedent to which Comyn and Mackall contributed their money and financial credit and to which decedent contributed his "interest" in the old business, or that the 200 shares of stock was an outright gift by Comyn and Mackall by reason of the fact that it was never intended by Comyn and Mackall that decedent should be personally liable on his note for $20,000, but should pay for it out of the

dividends of the corporation. Both of these claims, cannot, of course, be correct.

It is evident that it was Comyn and Mackall who furnished the financial backing necessary to buy up Jones' interest. The amount of cash furnished by them was $12,000 which, with the $55,000 borrowed on their credit with the Anglo Bank, furnished $67,000 of the $70,000 purchase price paid to Jones. This was supplemented by the $1500 furnished by Fleishhacker and the $1500 furnished by Humphrey, but it is apparent that Comyn and Mackall were the real parties in interest in the deal with Jones. The minutes of The Western Stopper Company were worded to reflect this interest for the minutes of the corporation set out that 995 shares of the stock of the new corporation were sold to Comyn and Mackall for $99,500. By this means, it was established on the records of the corporation that Comyn and Mackall were the owners of the stock (with the exception of that issued to the original incorporators) and by virtue of the ownership of all stock interests of the corporation, in effect the owners of the assets of the stopper business owned by the new corporation. Contestant claims that this set-up was merely a fictional form of corporate procedure and that the court should look behind it to determine that decedent had contributed for his 200 shares or one-fifth interest in the new corporation, his interest in the old Western Stopper Company. Unless this is done, it is obvious that decedent's interest, if any, was completely wiped out by the incorporation of the new company, The Western Stopper Company. Conceding that the 995 shares of The Western Stopper Company were not issued to Comyn and Mackall, but that there were issued directly to Comyn, 300 shares, to Mackall, 300 shares, to decedent, 200 shares, to Fleishhacker, 100 shares, and to Humphrey, 100 shares, this fact does not furnish proof that the intention of the parties as to the nature of the deal was not correctly expressed by the form of procedure adopted. Such procedure could easily have been adapted to show a claim of ownership by decedent in the old corporation. Moreover, the fact that the certificate of stock was attached to the note of decedent as security for the payment of the note, and decedent was not to receive the certificate of stock until the note had been paid, carries the implication that decedent's interest in the old corporation at the time of the incorporation of the new cor-

poration, The Western Stopper Company, was of no present financial worth. Moreover, in response to a query to Mr. Comyn in his deposition, "Did you also agree to do this because of Mr. Duncan's interest in the old company?" he replied, "No, because we didn't know what his real—what his ownership might have been in the old company."

The finding relative to these initial shares of stock in The Western Stopper Company acquired by decedent in 1919 is specifically to the effect that said shares were acquired by him in consideration of the execution by him of his promissory note for $20,000 and his agreement to continue as manager, and we think the trial court was justified in accepting this version of the transaction. There can be no doubt, in the light of the record, that the right to subscribe for the 200 shares was given to decedent because Comyn and Mackall wished to "tie him into the business and keep him as manager of the business". Comyn testified that decedent was a very capable business man and they were anxious that he should exercise his knowledge, experience and ability to make the newly organized corporation prosper. Comyn's testimony was that "The consideration was bringing the business to us, and his capability and his knowledge of running it and understanding and tying himself up to the business. We wanted him in the business because we didn't know anything, as I say, about the stopper business." Of course, it cannot be successfully maintained that the business ability and experience gained by a business man prior to his marriage could possibly be considered separate property as any such conclusion would necessarily lead to ridiculous results. Despite the fact that Comyn testified that it was his understanding that decedent was to pay his promissory note only out of dividends of the corporation, if he so desired, the trial court found that there was no agreement to that effect. Comyn did not testify positively, but only that he believed that to be the understanding and it may be that the trial court did not consider this evidence sufficiently definite to establish a binding agreement upon the parties. Comyn did testify that decedent was not to receive the certificate of shares until the note had been paid. Whether there was or. was not such an understanding, such promissory note was a valid, enforceable obligation and could have been collected despite the understanding. (*Quartz Glass & Mfg. Co.* v.

*Joyce*, 27 Cal. App. 523 [150 Pac. 648].) The fact that the note executed by decedent and the attached certificate of stock was delivered by decedent, who was manager of The Western Stopper Company, to Comyn and Mackall, who retained it in their possession until it was redelivered to decedent does not conclusively negative this conclusion. The finding of the trial court that the 200 shares were not acquired as a gift but for a valuable consideration is sufficiently supported by the evidence.

As before pointed out, these findings are sufficient to support the judgment that all the property of decedent was community property. We have, however, carefully read the record with reference to the subsequent acquisition by decedent of further shares in The Western Stopper Company until he finally became the sole owner thereof, and the final acquisition by him of 2,500 shares of Crown Cork & Seal Company. The most that can be said is that there is a conflict in the evidence. While contestant places considerable reliance upon certain acts and conduct of decedent as proof that he considered the stock acquired by him as separate property and therefore corroboration of contestant's claim that it was his separate property, we are of the opinion that much of the proof relied upon is also susceptible to the construction that decedent considered the property community property. Thus the fact that he dealt with it as his own, in view of the fact that he controlled it all as community property, is not convincing proof that it was his separate property. Likewise, the fact that the stock was taken in his name creates no presumption that it is his separate property. The presumption which does arise in the case of property held by the wife in her own name that it is her separate property does not arise in the same situation when the property stands in the name of the husband. While it is true that the record shows that the principal of the wife's separate property was kept separate and apart from decedent's business dealings and was not invested in any of the property acquired by him, this is not sufficient to prove that he considered all the property which was not her separate property as his separate property. The fact that she owned considerable separate property and that he owned none would explain the care with which the wife's property was kept intact. The fact, therefore, that she did not commingle the principal of

her separate property with the community property is no indication that property not her separate property was his separate property. Nor would the fact that in his personal ledger appeared the notation in his handwriting, "2000 shares Crown Cork & Seal belongs to E.C.D. [decedent]. 500 shares belongs to L.C.N." [the wife] necessarily mean anything more —as it is admitted that he had given her as her own 500 shares—than that the 500 shares were her separate property and the 2,000 shares were community property. It is quite normal and natural for a business man who by his own efforts has built up a prosperous business to consider the community property as his property, and if he desired to be careful to keep his wife's separate property separate from his own business, he might well have made the above notation.

■ With reference to the payment by contestant to decedent of $2,776, the trial court found that it was not a gift, but money due to decedent for advances made by decedent to contestant with reference to the purchase of the house and lot by contestant. The fact that the check was for exactly one-half of the sale price of the house and lot and not in round figures would tend to support this conclusion. And, as further found by the court, in any event, such money was so commingled with the community funds as to lose all earmarks as separate property. The record shows that the check was deposited in decedent's account in October, 1920, and was thereafter checked out with no definite trace as to what it was expended for.

■ Some argument is made that the assets of W. B. Crane & Co., Ltd., having been partnership property, was necessarily the separate property of decedent since under subdivision (e) of section 2419 of the Civil Code it is provided that a partner's right to specific partnership property is not community property. It is conceded that the assets of the partnership were transferred to the corporation, and we are of the opinion that thereupon the rules applicable to the nature of the ownership of partnership assets ceased to apply. Having been acquired by the use of community funds, since according to the findings of the trial court there were no separate funds, such assets must necessarily be considered as community property.

■ Contestant complains that the findings were not served upon her but were signed ex parte. Contestant con-

cedes that this was not reversible error. While it is true under the authorities of this state, that the serving of findings upon an opponent is not mandatory but merely directory, we are strongly of the opinion that the trial court should refuse to sign findings until proof has been made that this duty has been complied with.

Inasmuch as under our conclusion the entire estate is to be distributed to the surviving wife as community property, the contestant no longer has any financial interest in its preservation. As stated in her brief, it is immaterial to her how much of the family allowance may be drawn from the respondent's share of the estate, nor is she concerned with the amount of the allowance to respondent for fees for extraordinary services of her attorney as long as those fees do not come out of any share of the estate which might be allocated to her. The same situation is true with reference to whether respondent correctly returned 1500 shares of Crown Cork & Seal Company stock as community property retaining 500 shares as her separate property, or whether she should have returned 2,000 shares as community property. These accounts have been scrutinized by the trial court, and we are not disposed to consider the objections to them further.

The judgment with reference to the settling of the final and supplemental account of the administratrix and the decree of distribution ordering distribution of the entire estate of decedent to respondent as community property is affirmed.

Shenk, J., Seawell, J., Edmonds, J., and Langdon, J., concurred.

Rehearing denied.