[Civ. No. 13363. First Dist., Div. One. June 11, 1947.]

Estate of THOMAS J. KANE, Deceased. THOMAS J. KANE, JR., Respondent, v. HENRIETTA D. KANE, Deceased, Defendant; WELLS FARGO BANK & UNION TRUST CO., as Special Administrator, etc., (Substituted Defendant) Appellant.

W. L. A. Calder and S. A. Riley for Appellant.

Tobin & Tobin and Charles B. Collins for Respondent.

WARD, J.—This appeal involves the ownership of three parcels of real property. The deeds show ownership in "Thomas J. Kane and Henrietta D. Kane, his wife." The question to be determined is whether the three parcels were community property or were held by the husband and wife as tenants in common. The trial court determined that the property was held as community property. From that determination the wife appeals.

The marital relationship between the parties commenced on April 30, 1921, and continued until the death of Thomas J. Kane on November 30, 1943. Their financial relationship may be divided into three periods; the first from on or about the date of their marriage in 1921 until some indefinite date in the early part of 1927; the second from the early part of 1927 until October, 1936; the third ran until the death of Thomas J. Kane in 1943. Their last period is better understood when considered in connection with the second; the first period is merely explanatory of certain features of the events which followed.

As regards the facts, there will appear references to Henrietta D. Kane's sisters, to Thomas J. Kane's sisters, and to his two sons by a former marriage; John, who died prior to the death of his father, and Thomas J. Kane, Jr., the plaintiff and respondent herein. To avoid confusion, the husband of Henrietta will be referred to as Thomas, Sr., the son, as Thomas, Jr., and Henrietta will be referred to as Henrietta, as in the respective briefs of the parties hereto.

Thomas, Sr., and Henrietta met in Chicago, Illinois, during the month of November, 1920. He was a supervising head of one of the departments in a store designated as "Stop and

Shop." Previously Henrietta had worked for a telephone company in Chicago. Her duties seem to have consisted of visiting cities and towns in the company's territory and acting as "trouble shooter" for the female employees of the company. Her health required a cessation of such activities. She took a long vacation and thereafter accepted work under the direction of Thomas, Sr., who was then fifty-three years of age; Henrietta was then fifty. They were married on April 30, 1921. At the time of their marriage Henrietta possessed money and securities of a value of approximately $10,000. Thomas, Sr., appears to have been without substantial funds. There was a premarital understanding, according to Henrietta's testimony, that they would come to California and go into business; "it was to be a fifty-fifty proposition; we were to be partners." After the marriage there was a reassertion of the "fifty-fifty" partnership agreement in the conduct of their business, as appears from the testimony of Henrietta.

On May 5, 1921, the couple left Chicago for San Francisco. It was not until October 17, 1921, that a suitable location for the conduct of a café was procured. This was on Haight Street in San Francisco. In the meantime the honeymoon of the couple, traveling expenses and costs incurred in preliminarily investigating locations, and in starting the business, were borne by Henrietta, who advanced to Thomas, Sr., $5,197.44. Toward the financing of the café Nora, a sister of Thomas, Sr., and his wife Henrietta each invested $3,000. Living quarters nearby were selected and occupied by Thomas, Sr., his wife, his sister Nora, and his son John, all of whom worked in the café. Henrietta, in addition to her other duties, paid the bills of the café and of the home from the proceeds of the business. No salaries were paid the participants; when they needed money for clothes or for any other purpose, money was taken from the cash register and a notation made of such withdrawal. After approximately two years and eight months of profitable business the place was sold for $8,000, and Nora and Henrietta received their respective investments, plus interest. The balance was divided equally between Thomas, Sr., Henrietta, Nora and John, less the individual withdrawals of each.

After the disposition of the Haight Street business, Thomas, Sr., decided that he would like to go into the mining business. Several months passed in an effort to locate a suitable property. In company with his son John and an engineer,

Thomas, Sr., visited many sites and finally located in Tombstone, Arizona. A large portion of his money had been used in investigating various mining properties, and Henrietta's money in great part was used in the purchase of an interest in one. It was but a short time when, as the result of the gold mining venture, Thomas, Sr., and Henrietta found themselves with $300 in cash and an automobile. In response to a call from a sister who was ill, Henrietta went to Chicago, and Thomas, Sr., used the car to return to San Francisco.

In 1926, Henrietta's sisters persuaded her to ask Thomas, Sr., to return to Chicago. They offered to loan $5,000 to Henrietta so that she and her husband could go into business there. With this understanding between husband and wife a promissory note, bearing five per cent interest, was executed by the parties in exchange for the $5,000. On February 17, 1927, a restaurant was purchased on Roosevelt Way in Chicago for a sum in excess of the amount of the loan. Where the additional money or security was obtained is not mentioned in the transcript of evidence. This business was sold in less than a year and a half for $10,500. Henrietta's sisters were repaid, and with the profit from the business another restaurant was purchased in Chicago—on Sheridan Road. The record is not clear as to the amount of the purchase price, but it indicates that it was operated at a profit although it was sold at less than its purchase price.

About March 1932, Henrietta and Thomas, Sr., returned to San Francisco and subsequently $6,700 in their names with a Chicago bank was transferred to their credit with a San Francisco bank. For some months Henrietta worked for John, one of the sons of Thomas, Sr., in a restaurant conducted by him on Third Street, at a purported salary of $125 a month, which salary she never received, however.

Late in December 1932, Thomas, Sr., and Henrietta started a restaurant business at Turk and Mason Streets in San Francisco under the name of Kane's Log Cabin. The financing of this business is not made clear in the record, but as soon as it was opened John seems to have taken over the management. About the same time Thomas, Sr., Henrietta and John became partners in the Third Street restaurant. Thomas, Sr., closed the Third Street place for several months for renovation. Henrietta claimed that the remodeling cost, approximately $23,000, and so stated in a deposition, was paid for out of the profits of the business. The record discloses that John,

in previously operating the Third Street restaurant, borrowed $8,000 from his aunts, the sisters of Thomas, Sr. Shortly after John took over the Turk and Mason restaurant, it was agreed that such business would be incorporated; Thomas, Sr., and Henrietta were to receive approximately an equal number of shares of stock. The stock was never issued and the corporation was subsequently dissolved. Less than ten months thereafter, John died, leaving his one-half interest in the Third Street restaurant and a $10,000 life insurance policy to Thomas, Sr. The insurance was deposited in the joint commercial account of Thomas, Sr., and Henrietta, but subsequently Thomas, Sr., transferred $8,000 of it to his personal savings account. John had been purchasing pastry from the Third Street restaurant for use in the Turk Street place of business and had so incurred a debt of $3,000. After his death, John's wife paid $4,000, and Thomas, Sr., and Henrietta the balance, of John's indebtedness to his aunts.

On December 23, 1935, a corporation was organized to take over the Third Street business. Thomas, Sr., received fifty-one per cent of the stock and Henrietta forty-nine per cent. On October 20, 1936, the business and assets were reassigned to Thomas, Sr., and Henrietta, and the corporation dissolved.

During all of the business association of Thomas, Sr., and Henrietta no salary was paid either spouse. Personal expenses were met by resort to the cash register, with a notation of the withdrawal, or checks were made out against the commercial bank account of the parties.

About this time the Third Street restaurant was sold for $45,000 and $2,500 for stock on hand. After the sale, Thomas, Sr., desired to invest in a gold mine. Henrietta testified: "I told him I was going to take my money out of the [joint] account, and put it in my own [savings] account because none of my money was going into a gold mine." To this Thomas, Sr., said nothing. The bank accounts showed that on October 22, 1936, the first payment of $5,000 on the purchase price of $47,500 for the restaurant was deposited in Thomas, Sr.'s personal savings account. A $20,000 payment made on October 31, 1936, was deposited in their joint commercial account, and on the same day $10,000 was withdrawn and deposited in Henrietta's personal savings account, and $5,000 was withdrawn and deposited to Thomas, Sr.'s personal savings account. The next payment of $2,603.19, made November 21, 1936, was deposited $1,000 in Thomas, Sr.'s savings

account, $1,000 in Henrietta's savings account, and $603.19 in their joint commercial account. The succeeding payments of $7,516.25 were similarly divided. Thus about twenty-one thousand dollars was deposited in each of the two savings accounts and about five thousand dollars was deposited in their joint commercial account. The latter was used for traveling and living expenses. Thomas, Sr., and Henrietta discussed how they should invest the money received on the sale of the Third Street restaurant. Henrietta testified that she wanted to invest in San Francisco property rather than in gold mines. It appears that Thomas, Sr., took charge of the selection of suitable pieces of property, and that the cost of properties purchased was met by withdrawing approximately one-half of the purchase price from the savings account of each. Their bank books showed withdrawals from the two savings accounts; deposits from income were placed in their joint commercial account. They purchased a hotel at First and Folsom Streets for $17,000, a drug store on Steiner Street for $12,500 and a filling station at Cortland Avenue and Anderson Street for $13,500. The properties were all located in San Francisco. The first two parcels were paid for in cash; a portion of the purchase price of the filling station was met by promissory notes signed by Thomas, Sr., and Henrietta. The form of receipt, which may be designated as a receipt for money and documents, used by the three different title insurance companies in the three transactions are similar but not identical in their instructions. The insertions in the first two forms provide that the property was to be deeded to ''Thomas J. Kane and Henrietta D. Kane, his wife, tenants in common.'' In the third receipt the words ''tenants in common'' were omitted. All three deeds read to ''Thomas J. Kane and Henrietta D. Kane, his wife.''

Some light is thrown upon these transactions in an original deposition of Henrietta, which was presented by respondent, as evidence in the proceeding. The following appears: ''I take it, you and your husband, Mrs. Kane, had no discussions as to whose name the properties should go into when they were purchased, isn't that correct? A. Oh yes, we did, because I insisted upon having my name on every deed. . . . Q. All right. A. And my name was put on all of the deeds afterward. Q. What was the discussion you had with reference to the hotel property? A. Well, only that I should have my name on it, and not have it in his name alone, because that

would leave me out altogether. Q. How did you first learn that the hotel property was going into your husband's name alone? A. When I saw the deed. Q. Where did you see the deed? A. He brought it home. Q. Where did you see it? A. When I saw it at home. I took care of all the papers, and all of the writing. All writing that had to be done I did, and the bookkeeping. MR. CALDER [attorney for appellant]: Q. Do I understand he brought a deed home showing that the title went to him alone? A. Yes, I think he did. MR. CALDER: Q. And then what happened? A. Well, I made him put my name on it, or had my name put on it; and it is recorded in the City Hall, too, with my name on it.'' One of the title company's receipts is signed ''Henrietta D. Kane'' and ''T. J. Kane.'' There is no evidence in the record that Thomas, Sr., or Henrietta knew the legal differences or subtleties between the designations of joint interest, partnership interest, interest in common or community interest. There is evidence to show that Henrietta proposed to protect her rights as she understood them, and there is evidence that it was Henrietta who desposited the income from the three pieces of property in the bank accounts.

On November 30, 1943, Thomas, Sr., died. His last will, signed December 4, 1942, provided in part: ''Whatever estate I may die possessed of will be community property of myself and my beloved wife, HENRIETTA D. KANE. I confirm and allocate to her one-half thereof in recognition of her rights. In addition thereto, I give and bequeath her the sum of One Thousand Dollars ($1,000.00).'' Other bequests were made to four sisters, but two thirds of the balance of his estate he bequeathed and devised to his son Thomas J. Kane, Jr. The will further provided: ''I hereby nominate and appoint as executrix of this, my Last Will and Testament, my said wife, HENRIETTA D. KANE, and I direct that no bond be exacted of her by any court at any time in connection with the probate of this will or the administration of my estate.

''. . . I hereby direct that my said executrix shall have full power to sell any property belonging to my estate without obtaining any order of court therefor, but any and all such sales shall be returned to and confirmed by the court having jurisdiction of the probate of my will and the administration of my estate.''

On February 1, 1944, Henrietta filed an inventory as executrix of the estate of her deceased husband. Included

therein were a deposit of $1,729.92 with Wells Fargo Bank and "an undivided one-half interest in" three parcels of real property. July 24, 1944, Thomas, Jr., filed a "Petition to Determine Ownership of Property," in which he alleged that said real property was the community property of Thomas, Sr., and Henrietta, and that under the will Henrietta was entitled to one-half thereof plus $1,000; he prayed that the court so order and direct her to file an inventory setting forth Thomas, Sr.'s estate as the owner of the entire property. Henrietta filed her answer to said petition August 15, 1944, denying that the whole of the real property was community property and alleging that she owned an undivided one-half of each of the three parcels.

October 23, 1944, Henrietta filed "her first and final account of her administration" in which she listed rents received and taxes and insurance paid. This showed that a balance of $1,231.16 was due her "for advances on account of disbursements." At the same time Henrietta petitioned for final distribution of the estate. The petition set forth the terms of the will and that Thomas, Sr.'s estate owned an undivided one-half interest in three parcels of real property. May 24, 1945, Henrietta filed a supplemental statement showing that a balance of $1,542.53 was due her.

May 24, 1945, Thomas, Jr., filed his objections to the first and final account and to the petition for distribution. His objections were based upon the facts that Henrietta claimed Thomas, Sr., owned only one-half of the real property; that the account included only one-half of the rent of said properties, and that said account was uncertain.

The court found, referring to the money used to purchase the three parcels of real property: "That all the property described in the preceding paragraph hereof up to and at the time of the death of the said THOMAS J. KANE, also known as T. J. KANE was the community property of said THOMAS J. KANE and HENRIETTA D. KANE, his wife, and all of said property was acquired by said THOMAS J. KANE and HENRIETTA D. KANE subsequent to their said marriage and by their joint efforts, and no part or portion of any of said property was owned by said HENRIETTA D. KANE before her said marriage or was thereafter acquired by her by gift, bequest, devise or descent and said HENRIETTA D. KANE did not contribute to any part of the purchase price of any of said property from any property or funds owned by her before her said marriage

or thereafter acquired by her by gift, bequest, devise or descent or from the rents, issues or profits of any such separate property; that no part or portion of any of said property particularly described in the preceding finding hereof, or any interest therein, is now or at any of said times or at any time whatever, was or is the separate property of said HENRIETTA D. KANE.''

It appears necessary herein to relate, at length, the history of the marital and financial relations of the parties from the time of their marriage in order to throw light upon subsequent events. It is not necessary to decide the legal interests of the parties up to the time of the gold mine disaster. It is sufficient to say that all that remained—three hundred dollars and an automobile—was disposed of to the satisfaction of Thomas, Sr., and Henrietta. · So far as the record shows, no claim or demand was ever made by Henrietta upon Thomas, Sr., for the return of the money used immediately after marriage for the honeymoon trip or in looking for a business location, or for that invested or earned in the San Francisco Haight Street café. Everything was dissipated in the Tombstone mine. Referring to the Haight Street business, the transcript shows: "Q. And how much did you put in of money out of your moneys? A. I put in $3,000, in the business; but that wasn't all we spent. I had been spending all the other thousands of dollars before. Q. That is before—— A. Before we got into business. Q. That is, all of the expense that was incurred by Mr. Kane and yourself in looking for a place of business? A. In living. Q. And your living was paid out of the money which you had? A. Yes, sir. Q. Did or did not Mr. Kane pay any part of that? A. No, he did not, because he didn't have anything. That was all right with me, too.''

The source of the money used in the purchase of the three parcels of property in San Francisco consisted of profits obtained through investment of the $5,000 procured from two of Henrietta's sisters as a loan. It has been suggested that the sisters of Henrietta fixed the character of the original source of the property as the separate property of Henrietta in that they would not have loaned the money except upon the theory that Henrietta would repay the loan. The above promissory note was executed by the wife and the husband. (Civ. Code, § 167.) It was known that Thomas, Sr., would be the director and manager of any property purchased. This loan, plus the interest, was paid during the period that

Thomas, Sr., and Henrietta conducted restaurants in Chicago. The benefits derived from the loan were later mingled as between the spouses, and intermingled with property of John, the son of Thomas, Sr.

Appellant cites cases which may be differentiated. In *Estate of Ellis*, 203 Cal. 414 [264 P. 743], the decedent husband had acquired stock upon the faith and credit of his separate property. It was held that the stock was his separate property. Unlike the present situation, the spouse of Ellis was not even known in the transaction. In *Dyment* v. *Nelson*, 166 Cal. 38 [134 P. 988], it was held that a yacht purchased with the separate property of the wife was her separate property, and the fact that her husband joined in promissory notes used in its purchase did not alter the status of the property in that respect. Subsequently the husband attempted to sell the yacht. In the present case, at the time the note to Henrietta's sisters was signed by her and her husband, there is no evidence that any separate property existed. The money was to be used in the purchase of a restaurant business. Previous experience showed that Thomas, Sr., was expected to make profits sufficient to pay the loan. It is admitted in appellant's opening brief that he was "a man of wide business experience." In *Hogevoll* v. *Hogevoll*, 59 Cal. App.2d 188 [138 P.2d 693], the court was discussing Civil Code, section 164 as it read in 1914.

The question—Is there evidence to support the findings?—should be answered in the affirmative. The trial court had the right to conclude that Henrietta, as a witness, seemed at times to be keenly alert; on other occasions her memory appeared to be poor. Her attorney found it necessary to propound many leading questions. Some of the exhibits contained notations which Henrietta claimed, in fact insisted, she had written at the time of making or executing the instruments, but the language used on one exhibit was the past tense—for instance, "8000.00 of this was mine." Decedent's declarations as to the nature of the property has not been shown to be untrue. In addition, decedent declared to his sister the general contents of his will. Thomas, Jr., testified as to a conversation with Henrietta, following his father's death, but before his will was read, in which she outlined the contents of the will; she further stated that she was to have one-half for "her folks" and the other half was to be used for her husband's family.

It is possible to draw a reasonable inference that when a husband and wife instruct a title company to prepare a deed to them as tenants in common, but the title company names only the husband as the grantee, and the wife objects and a new deed is prepared, as in this case, to "Thomas J. Kane and Henrietta D. Kane, his wife," the wife has waived any right to a tenancy in common, and it is mutually understood that the real property is to be community property.

That findings on community property interest are invariably accepted if there is some evidence of substance to sustain the finding, see *Fontes* v. *Menke,* 32 Cal.App.2d 303 [89 P.2d 669]; *Baylis* v. *Baylis,* 48 Cal.App.2d 674 [120 P.2d 89]; *Williamson* v. *Kinney,* 52 Cal.App.2d 98 [125 P.2d 920]. To prevail, appellant must show that there is no other inference, as a matter of law, than that the disputed portion of the property was the separate property of Henrietta.

It has been suggested that Thomas, Sr., made a gift of or relinquished about half of the money received on the sale of the Third Street property to Henrietta. The record discloses that John by will left his interest in the Third Street business to his father. However, the evidence is not clear as to the amount of John's indebtedness to Thomas, Sr., also the percentage of the Turk and Mason Street business belonging to Thomas, Sr., or Henrietta or John is not definitely fixed in the record. Whatever amount, if any, of John's share, Thomas, Sr., relinquished to Henrietta, his conduct did not indicate that it was to be Henrietta's separate property, and she does not testify to such fact.

Thomas, Sr., and Henrietta received income from the three parcels of property. A business conducted by a husband and wife through their own personal direction, activity and ability is regarded as community property. (*Estate of Barnes,* 128 Cal.App. 489 [17 P.2d 1046]; *Estate of Caswell,* 105 Cal. App. 475 [288 P. 102]; *McCall* v. *McCall,* 2 Cal.App.2d 92 [37 P.2d 496].) "In accordance with the presumption existing where a married woman invests in a partnership business, that the transaction is with community funds, . . . unless she can trace her separate funds, the interest in the business thus acquired goes to the community, and, where the partnership is with her husband, additional difficulty in tracing her interest arises by reason of the commingling of her funds with his, so that the funds so invested usually become community property.

"An investment of community assets in a business or in a partnership remains community property, and a transfer of

the investment from a partnership to a corporation does not change its status." (41 C.J.S., p. 1067, § 497.) As upholding the last statement just made, see *Estate of Duncan,* 9 Cal. 2d 207, 224 [70 P.2d 174].

Section 164, Civil Code, provides in part: ". . . except, that when any of such property is acquired by husband and wife by an instrument in which they are described as husband and wife, unless a different intention is expressed in the instrument, the presumption is that such property is the community property of said husband and wife." Appellant contends that disputable inferences and presumptions are the weakest and least satisfactory character of evidence, citing *Simonton* v. *Los Angeles T. & S. Bank,* 205 Cal. 252 [270 P. 672], wherein *Savings & L. Soc.* v. *Burnett,* 106 Cal. 514 [39 P. 922] is cited, a case in which one of the questions was— Did the parties follow the ordinary course of business? (Code Civ. Proc., § 1960, subd. 2.) Appellant relies on *In re Bauer,* 79 Cal. 304 [21 P. 759], in which it was held that proof of ownership of funds at the time of marriage, establishes the ownership thereof, together with profits therefrom. Both spouses joined in a declaration of homestead and inserted therein (p. 310): " 'We further declare that said property was to the extent of three thousand dollars acquired and improved with the separate estate of Charles Bauer.' " The court then said: "This declaration or recital was on the part of Mrs. Bauer self-dissevering, and can be used against her, especially as she is claiming under her husband, with whom in the homestead she was a tenant in common."

Mr. Witkin in his Summary of California Law (1936) states (pp. 687, 686): "(a) C.C. 164, as amended in 1935, states that if property is acquired 'by such married woman *and* any other person the presumption is that she takes the part acquired *by her, as tenant in common.*' (b) Formerly it was held that they became tenants in common, the interest of the *wife being separate property,* and that of the *husband, community property.* (*Dunn* v. *Mullan* (1931) 211 Cal. 583, 296 P. 604; *Estate of Regnart* (1929) 102 Cal.App. 643, 283 P. 860.) The statute (C.C. 164) now provides, however, that when property 'is acquired by husband and wife by an instrument in which they are *described as husband and wife',* the presumption is that the property is *community.*" "Property acquired by either spouse during the marriage is presumed to be community property, and this presumption can only be overcome by strong evidence to the contrary."

In *Estate of Duncan*, 9 Cal.2d 207, 217 [70 P.2d 174], the court said: "At the very outset, contestant was confronted in opposition to her claim by the well-established presumption that all property left by decedent, acquired after marriage, is presumed to be community property. This presumption is fundamental to the community property system. (3 Cal.Jur.Supp. 553.) This presumption has greater force in cases where the marriage has been a long-continued relation than in cases where the marriage was entered into shortly before the acquisition of the property. [Cases cited.] The burden of producing clear and satisfactory proof that the property was the separate property of decedent was upon the contestant as the respondent was entitled to rely upon the presumption that it was community property. [Citing cases.] It is, of course, not necessary that the clear and satisfactory proof required should amount to a complete demonstration, for it has been held that to counterbalance the naked legal presumption only that degree of proof is necessary which ordinarily produces conviction in an unprejudiced mind."

In 3 California Jurisprudence, Ten-Year Supplement, page 537, section 48, it is said: "While a few cases inadvertently refer to the wife's earnings as her separate property, it is an essential part of the community system that the earnings of both spouses are community property, and the decisions clearly recognize the fact." (See Note 5.) Under these circumstances the finding that the property was community property is amply supported by the presumption and was not rebutted, as a matter of law, by the evidence.

Since the argument and submission of this cause, it has come to the attention of the court that appellant Henrietta D. Kane has died. It is ordered, therefore, that this judgment be filed *nunc pro tunc* as of June 4, 1947, the day prior to her death. (*Holman* v. *Stockton Sav. & Loan Bk.*, 49 Cal. App.2d 500, 510 [122 P.2d 120]; *Estate of Randall*, 194 Cal. 725 [230 P. 445]; *Estate of Dolbeer*, 149 Cal. 227 [86 P. 695, 9 Ann.Cas. 795]; 2 Cal.Jur. 974.)

The judgment appealed from is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied July 3, 1947, and appellant's petition for a hearing by the Supreme Court was denied August 7, 1947.