[Civ. No. 16471.   First Dist., Div. Two.   Jan. 19, 1956.]

Estate of CATHERINE DORAN, Deceased.   MARGARET E. MILLER et al., Appellants, v. CECIL CHESWORTH et al., Respondents.

John P. Doran, in pro. per., Sylvester Andriano and Leo Andriano for Appellants.

Haskell Titchell, Samuel Schekman and Appel, Lieberman & Leonard for Respondents.

KAUFMAN, J.—This is an appeal by the heirs of the predeceased husband of Catherine Doran from an order and decree of the probate court, determining that they are not heirs of decedent, Catherine Doran, who died intestate on March 18, 1949. The basis of this decision was a finding that none of the property in the estate of decedent had its origin in the community property of decedent and her predeceased spouse or in his separate property.

The appellants herein, all heirs of decedent's predeceased husband, are divided into two groups, represented by different counsel, and opening briefs have been filed by each group. Appellants represented by John P. Doran, who is also a party, base their appeal solely on the ground that the trial of this matter before a referee was illegally ordered by the judge of the probate court. The remaining group of appellants represented by Sylvester and Leo Andriano, do not question the legality of the reference, but contend that the evidence is insufficient to support the decree, and urge errors in the admission of certain evidence.

The appeal of the claimants represented by John P. Doran will be first considered, since it is based on matters of procedure only. These appellants, nieces and nephews of the deceased Captain Patrick Doran, are Margaret Miller, Alice F. Phelan, Sister Mary Francis, Joseph A. Doran and John P.

Doran. They contend that the probate court did not have jurisdiction to order the reference, since they did not consent in writing or in open court to the appointment of a referee, as required by section 638, Code of Civil Procedure. Section 638 provides that ''A reference may be ordered upon the agreement of the parties filed with the clerk, or judge, or entered in the minutes or in the docket.''

Objections to the petition to determine heirship and a demand for jury trial on behalf of Margaret Miller and Alice F. Phelan were made by John P. Doran and filed September 4, 1953. An answer to the petition to determine heirship was filed on September 15, 1953, by Daniel Doran, a claimant represented by the Andriano firm. The remaining claimants, some of whom are not in each group of appellants, filed an appearance on October 29, 1953, in which John P. Doran, Sylvester Andriano and the firm of Ryan and Ryan were designated as counsel. All appellants, therefore, except Margaret Miller and Alice F. Phelan, at this stage of the proceedings were represented by Ryan and Ryan as attorneys of record.

On October 29, 1953, there was filed an association of attorneys which states: ''SYLVESTER ANDRIANO, attorney for Respondent, DANIEL E. DORAN, in the above matter and JOHN P. DORAN, attorney for MARGARET E. MILLER and ALICE F. PHELAN, Respondents in the above matter, and JOHN P. DORAN, individually and as an heir of CATHERINE DORAN, deceased, hereby associate Ryan & Ryan as attorneys for all the Respondents in the above-entitled action.'' This association was signed by Sylvester Andriano, John P. Doran individually and as attorney for Margaret E. Miller and was accepted in writing by Ryan and Ryan. All counsel thereafter entered into a stipulation waiving jury trial and setting the trial as a court case for December 10, 1953. This stipulation shows Ryan and Ryan as attorneys for respondents (the appellants herein).

On December 10, 1953, Mr. Daniel Ryan, of Ryan and Ryan, and Mr. Leonard, attorney for Cecil Chesworth, one of the heirs of Catherine Doran, appeared when the matter was called for hearing. Mr. Leonard told the court that Mr. Thomas Ryan had advised him that the court might desire a reference to be made. Mr. Daniel Ryan then stated that his firm ''plus Sylvester Andriano and an attorney named John P. Doran'' were attorneys for the heirs of the predeceased spouse of decedent. The court stated that it would not order a reference unless everyone was before the court and

everyone agreed. Mr. Ryan stated that "By verbal stipulation we have all agreed that Mr. Edwards may hear it as referee, and I believe also that your office [addressing Mr. Leonard] and Mr. Titchell's office have so agreed." Mr. Leonard replied: "That is correct." Mr. Ryan then said: "Mr. John Doran represents two heirs: he says that he neither objects nor agrees to it, but he will not be present." The court: "As I understand it on the basis of the record at the present time, all parties are represented here." The court then stated that the matter would be referred to Mr. Edwards, noting that all parties were represented and that no one objected.

When the trial began that afternoon before the referee, Mr. Titchell, attorney for Emily Wilson et al., heirs of Catherine Doran, stated that the reference was made pursuant to an agreement between Mr. Leonard and Ryan and Ryan. Mr. Daniel Ryan then said: "That is correct, except that Mr. John Doran appears as an attorney for Mrs. Margaret Phelan and Mrs. Miller, and I understand that he has neither agreed nor objected to this reference." Mr. Leonard then called attention to the association of attorneys, previously noted, and Mr. Ryan said: "And Ryan & Ryan consent to this reference." Mr. Leonard: "And whether Mr. Doran does or does not consent, you people are of record as representing the same persons as he does." Mr. Ryan: "That is correct."

The association of attorneys which states that Ryan and Ryan are associated as "attorneys for all the Respondents in the above-entitled action" and signed by John P. Doran both individually and as attorney, establishes without question that Ryan and Ryan had authority to bind him and the other appellants represented by him, in any court proceeding while that association was in effect. We conclude that section 638, Code of Civil Procedure, was substantially complied with and that all parties consented to the reference in open court.

The language of section 638 is comparable to that used in section 283, Code of Civil Procedure, which provides that an attorney shall have authority "To bind his client in any of the steps of an action or proceeding by his agreement filed with the clerk, or entered upon the minutes of the court, and not otherwise."

In *Harris* v. *Board of Education*, 72 Cal.App.2d 43, 50 [163 P.2d 883], it was said that it was clear that sections 283 and 1023 of the Code of Civil Procedure "were not

enacted to permit or encourage the repudiation of a stipulation solemnly made by an attorney in open court, but the sections were for the purpose of requiring such a record of the stipulation as would preclude any question concerning its character or effect.'' The court then quoted from *Webster* v. *Webster,* 216 Cal. 485, 489 [14 P.2d 522], the following language: ''Nothing in section 283 of the Code of Civil Procedure militates against the binding effect of a stipulation entered into and executed by the parties in open court and duly reported in the proceedings of the trial.''

In the present case, although we find in the clerk's transcript no record made by the clerk in the minutes regarding the agreement for reference, the reporter's transcript shows that such an agreement was entered into by attorneys of record for all parties. Furthermore, in the order and decree determining heirship it is recited that all parties agreed through counsel, and that ''Pursuant to the stipulation and agreement of all the parties, *which said stipulation and agreement* was entered in the minutes of this court, a reference was ordered.'' In *Garland* v. *Smith,* 131 Cal.App. 517, 523 [21 P.2d 688], wherein it was urged that the record failed to show that there was a stipulation that a reference be made, the court said that, ''It is perhaps a sufficient answer . . . to point out that the judgment from which this appeal is prosecuted recites that at the time the case was set for trial the respective parties to the action, through their counsel, stipulated and agreed in open court to a reference to a designated referee and that the court thereupon ordered the reference.''

The foregoing cases establish that the appeal by John P. Doran on the ground that the trial court did not have jurisdiction to enter the order and decree establishing heirship, is without merit. In their opposition to the presentation of the order and decree establishing heirship, appellants denied that they appeared personally or through counsel at the hearing of December 10, 1953, and denied ''that their calculated abstention was or is cured by any waiver or stipulation or default.'' In *Daniels* v. *Baldwin,* 115 Cal.App.2d 487, 489 [252 P.2d 351], it was said that where appellants ''voluntarily refrained from appearing at the time set for the hearing they cannot be heard to complain at this time as to the conduct of the trial.'' (And see *O'Day* v. *Superior Court,* 18 Cal.2d 540, 552 [116 P.2d 621]; *Estate of Daniels,* 120 Cal.App.2d 284, 292 [260 P.2d 991].) In *Garland* v. *Smith, supra,* it was noted that where a reference has been

ordered without consent, it is waived by a failure to take objection thereto. Appellants knew that the matter of the reference was to come up at the hearing of December 10, 1953, but nevertheless did not appear.

In the appeal taken by the heirs of Captain Patrick Doran, who will hereafter be referred to as the Andriano claimants, the only controversy is as to the community or separate character of the property.

When Catherine Doran died on March 18, 1949, there were four bank accounts standing in her name as joint tenant with two other parties. In subsequent litigation these transfers were set aside, and the bank accounts were restored to the estate of Catherine Doran. (*Wells Fargo Bank & Union Trust Co.* v. *Brady,* 116 Cal.App.2d 381 [254 P.2d 71].) At the time of Catherine Doran's death, the accounts totaled $81,069.81.

Catherine and Patrick Doran were married in 1891, and the captain died in July, 1907, approximately 42 years prior to the death of Catherine. At the time of the marriage, Patrick was first mate on a vessel and later became a captain and had command of several coastal vessels. There was testimony that the captain drank quite a bit during the period in which the couple lived in the home of Catherine's sister, Mary Chesworth, and that the couple were continually fighting. This testimony was given by Emily Wilson, a daughter of Mary Chesworth. Twice the captain was beached and had his license revoked. After the couple had made a trip to Europe, they separated for a period. The captain lived on the ship or at his brother's, and Catherine stayed with the Chesworths. Catherine wrote a letter to Mary Chesworth in 1903, while en route from Europe, stating that she had asked the captain several times where they would live on their return home, but he would always say "I don't know." She wrote that she could now see why he had wanted to live with her people, and that "He has not yet profited enough by me and my people, but would, as I told you before I left S. F. like to 'repeat the favor.' I shall not even let him come with me to see you I tell you this fight is on and I am going to keep it up to the end."

At one time Mary Chesworth sent approximately $2,000 to Captain Doran when he was in difficulties in New York, and another time she advanced him funds because he had temporarily lost his license.

In 1894, Catherine Doran and Mary Chesworth inherited from their mother, Bridget McCarthy, a pair of flats at 315

Austin Street, San Francisco. While the decree of distribution in the estate of decedent's mother recites that there is no personal property in the estate, both Mary Chesworth and Catherine Doran opened savings accounts each in the amount of $2,000 in the year following their mother's death. Emily Wilson testified that they had received some cash from their mother as well as the lots.

From late in 1897 until 1902, decedent and her husband lived with Mary Chesworth. They then moved to flats which Catherine Doran had built on a lot at Union and Webster Streets. Title to this property was taken in the name of Catherine Doran alone, and so remained until it was sold. In 1900, Catherine borrowed $2,000, and a deed of trust was given against the property as security. In April, 1895, Catherine Doran withdrew $2,500 from her account in the San Francisco Bank, and while there was no direct testimony as to what she used this money for, the purchase of the Union and Webster lot was made during this period. The borrowed money was shown to be a building loan.

The Dorans, except for the time when they were separated, lived at the Union and Webster property, and later moved to the new flats built by Catherine at Union and Baker. Construction of these flats was financed by a loan upon the Union and Webster property. In 1905, Mary Chesworth received real property from her uncle, Peter Lawton, and Catherine received an undetermined amount of cash. Decedent rented the Union and Webster flats after the couple moved to Union and Baker, until they were sold in 1912.

After the captain's death in 1907, Catherine rented her flats, at times took in boarders. She was an experienced seamstress and milliner. While there is no direct evidence on whether or not she was employed, she was observed to leave home early in the morning and return in the evening, her hours corresponding to a normal working day. Mrs. Wilson testified that decedent had helped the Wilsons' mother, who did piecework for Magnin's.

In 1912, Catherine sold the Union and Webster property and opened a new savings account at The American Trust Company, depositing therein the proceeds of the sale. In 1923, the Union and Baker Street property was sold. In 1925, she opened a savings account in The Anglo California National Bank with a deposit of $10,000. The source of this deposit has not been traced.

Appellants contend that the burden of proof was on the respondents to establish by clear and convincing evidence

that the property in the estate was separate property, citing *Estate of Jolly,* 196 Cal. 547 [238 P. 353] ; *Fennell* v. *Drinkhouse,* 131 Cal. 447 [63 P. 734, 82 Am.St.Rep. 361] ; *Estate of Duncan,* 9 Cal.2d 207 [70 P.2d 174] ; *Wilson* v. *Wilson,* 76 Cal.App.2d 119 [172 P.2d 568].

■ Appellants herein are statutory heirs of decedent, and therefore the burden is on them to show that the assets of the estate which they claim can be traced to community property or to the separate property of the deceased Patrick Doran. In *Estate of Harris,* 9 Cal.2d 649, 662 [72 P.2d 873], it was said that it has long been the rule "that where the right of a person as heir depends not merely upon the fact of such relationship plus the fact that the property he claims as heir had formerly been either the community property of the decedent and her previously deceased spouse or else the separate property of the latter, the burden of showing such additional fact rests on him." This principle was reaffirmed in *Estate of Rattray,* 13 Cal.2d 702, 705 [91 P.2d 1042], and recently in *Estate of Adams,* 132 Cal.App.2d 190, 203 [282 P.2d 190], Division One of this court stated that "when the surviving spouse dies intestate, the presumption is that all property in his estate is his sole and separate property, and the one claiming it to be community must assume the burden of proving what portion of that estate was in fact the community property of the·two parties at the time of the death of the predeceased spouse. . . . If, after the death of the predeceased spouse, the surviving spouse commingles the community property with his separate property so that it cannot be traced to its origin as part of the community property, the heirs claiming under Probate Code, section 228, have not sustained their burden, and the entire commingled property will be treated as the separate property of the surviving spouse."

■ A finding of the trial court based upon substantial evidence as to the nature of the property is binding upon appeal, for the question of tracing the nature of the property is primarily factual. (*Estate of Smith,* 86 Cal.App.2d 456 [195 P.2d 842].) ■ It is to be remembered, also, that the clear and convincing evidence required to overcome the presumption that property acquired during marriage is the community property of the parties does not have to amount to a complete demonstration, "for it has been held that to counterbalance the naked legal presumption only that degree of proof is necessary which ordinarily produces conviction in

an unprejudiced mind.'' (*Estate of Duncan*, 9 Cal.2d 207, 217 [70 P.2d 174].)

There is no evidence in the record that Captain Doran had any separate property at the time of his marriage. There was some testimony that his salary was $275 per month as a captain of coastal vessels. At the time of his marriage he was not yet a captain. There is evidence of his drinking, living with his wife's relatives instead of establishing his own home, of losing his license and borrowing money from his wife's people. There is evidence that the marriage was filled with conflict. From these circumstances it would seem that the trial court was justified in inferring that the captain's earnings, the only community property of the parties, were entirely consumed in supporting the couple, for whenever the captain met with a crisis in his career, he apparently had to borrow money. Circumstantial as well as direct evidence may be used to rebut the presumption that property acquired during marriage is community property. (See *Estate of Rattray*, 13 Cal.2d 702, 706 [91 P.2d 1042].) In *Estate of Ades*, 81 Cal.App.2d 334 [184 P.2d 1], it was observed that evidence that there was no excess of community income over living expenses, would as effectively prove that all assets of the estate were separate property, as would a specific showing of the separate source of each asset.

The Anglo California National Bank account which amounted to $22,222.69 at the time of decedent's death must be held to be separate property. It originated in 1925, some 18 years after decedent's husband's death, with an initial deposit of $10,000. The real property had all been disposed of since 1923, hence no rentals could have gone to make up the sum. Appellants contend that there is no evidence that decedent worked during the years since her husband's death, hence the funds must have come from a community source. The presumption, however, is that this is her separate property, unless appellants can prove its community source, for this was not property in her possession at the death of her husband. Furthermore, there was evidence that decedent had owned and disposed of separate real property, and evidence that she had kept boarders, and that for some time she left her home regularly during working hours, giving rise to an inference that she was employed. She was known to be a skilled seamstress and milliner. Since appellants have offered no evidence as to the source of this account, the finding that this account was separate property must be held to be correct.

The American Trust Company account totaled $21,414.28. It appears to be conceded that the proceeds of the sale of the Union and Webster property went into this account which was opened on February 2, 1912 (nearly five years after the death of Captain Doran), with an initial deposit of $6,801.85. Appellants contend that whatever was separate property was reflected in this account. They say that if it can be argued that the proceeds of the sale of the Union and Webster property account constitute the first deposit, then it can be argued that the $6,500 deposit in the account on October 8, 1923, the day that the deed was recorded which was executed by decedent to the Union and Baker property, was the proceeds of that sale. Appellants urge that this realty was community property. It had been acquired in decedent's name alone in 1905. Later that year she borrowed $2,000 on the security of the Webster and Union property, giving a deed of trust as security. During the year 1905, decedent received a cash inheritance from her uncle, Peter Lawton. It could reasonably be inferred that this money accounted for the purchase of the Union and Baker property. ■ Therefore, if it be assumed that the $6,500 deposit of October 8, 1923, is the proceeds of the sale of the aforesaid real property, since there is evidence to support a finding that said realty was separate property, the proceeds thereof would also be separate property.

■ The San Francisco Bank account was opened on September 8, 1894, by decedent with a deposit of $2,000. She used the alias of "Katie Longmoore" for the account. This was the year in which the real property in decedent's mother's estate was distributed equally to decedent and her sister Mary Chesworth. There was testimony that the sisters received cash from their mother as well as the Austin Street flats. A deposit of $2,000 was made in the Hibernia Bank by Mary Chesworth, decedent's sister, June 13, 1894.

The Hibernia Bank account was opened with a deposit of $600, on October 13, 1898. It was completely withdrawn on February 16, 1899. On August 28, 1900, a deposit of $130 was made, and from that date on it continued to grow until it amounted to $22,505.26, at the time of decedent's death. Respondents contend that from 1897 until 1902, the Austin Street flats were undoubtably rented and brought decedent an income from her separate property. From 1902 on, one of the Union and Webster Street flats would have been producing income. After 1905, she had available rents from both

flats at Union and Webster as well as from one flat at Union and Baker. Respondents say that rentals from the separate property can account for deposits made in the Hibernia account. There are numerous small deposits in this account from 1900 until the time of Captain Doran's death, and for some years thereafter. After 1920, the deposits appear to be chiefly of interest on June 30 and December 31 of each year. There are no deposits in the San Francisco Bank account in the years when decedent owned the flats which reflect rentals, since that account appears to consist entirely of the initial deposit of $2,000 and deposits of interest thereon. It can be reasonably inferred that income was realized from the flats owned by decedent. The witness, Emily Wilson, recalled that after the captain's death decedent lived in the lower flat and rented the upper. She also remembered that decedent took in boarders during the fair in 1915.

There is sufficient evidence in the record to rebut the presumption that the San Francisco and Hibernia bank accounts were community property. Furthermore, in the 42 years subsequent to her husband's death, decedent made deposits in these accounts particularly the Hibernia account, a large number of which cannot be deposits of interest. Appellants have offered no evidence as to the source of these funds. They must therefore be presumed to be separate, and it has been held that if after the death of the deceased spouse community and separate property is commingled so that the property cannot be traced to its origin as part of the community property, the heirs claiming under section 228 of the Probate Code, have not sustained their burden, and the whole will be treated as separate property. (*Estate of Adams,* 132 Cal. App.2d 190 [282 P.2d 190].)

It is urged that error was committed in admitting the testimony of Emily Wilson that decedent received cash from her mother and from the Lawtons. This testimony was brought out not only by respondents' counsel, but was first brought out by appellants' counsel on his examination of the witness under section 2055 of the Code of Civil Procedure, and again on cross-examination. No contradictory or impeaching evidence was offered by appellants. It could therefore be properly considered as evidence in the case. (*Daniels* v. *City & County of San Francisco,* 40 Cal.2d 614, 620, 625 [255 P.2d 785] ; *Figari* v. *Olcese,* 184 Cal. 775, 782 [195 P 425, 15 A.L.R. 192] ; *Balasco* v. *Chick,* 84 Cal.App.2d 802, 808 [192 P.2d 76].) Appellants elicited this evidence themselves

and did not move to have it stricken. Therefore, objection must be deemed waived. ▮ Such evidence admitted without objection or motion to strike may be considered in support of the judgment. (*Milburn* v. *Foster*, 8 Cal.App.2d 478 [47 P.2d 1106]; *Powers* v. *Board of Public Works*, 216 Cal. 546 [15 P.2d 156].)

▮ Appellants contend that it was error to admit the photostat of the bank account of Mary Chesworth showing the $2,000 deposit made by her in the same period of time when a similar deposit was made by decedent. The record shows that appellants' objection was made on the ground that the evidence was incompetent and irrelevant. Counsel for appellants said he would take opposing counsel's word that it was from the Hibernia Bank. The testimony was clearly relevant to corroborate the testimony that the decedent and her sister received cash in that year from the estate of their mother.

▮ Finally, there is an objection to the introduction in evidence of the letter written by decedent in the year 1903 in which she throws considerable light on the strained relations between her and her husband. This letter furnished corroboration of Mrs. Wilson's testimony that following the European trip, the Dorans were separated for a time. It was also evidence of intent or state of mind, and would therefore be an exception to the hearsay rule, for it showed a reason why decedent should carefully guard her separate property from her husband since she believed him to be taking financial advantage of her and her relatives. It would also demonstrate that it was improbable that the captain would be making gifts or transfers of substantial sums to decedent. (See *Hansen* v. *Bear Film Co., Inc.*, 28 Cal.2d 154, 173 [168 P.2d 946]; *Whitlow* v. *Durst*, 20 Cal.2d 523, 525 [127 P.2d 530]; *Anderson* v. *Newkirch*, 101 Cal.App.2d 171, 179 [225 P.2d 247].)

We conclude that the decree finds support in the record before us and therefore the order and decree determining heirship should be affirmed.

Decree affirmed.

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied February 17, 1956, and appellants' petition for a hearing by the Supreme Court was denied March 14, 1956.