[Civ. No. 21573.   Second Dist., Div. Two.   July 22, 1957.]

BRUCE GUERIN, as Executor, etc., Respondent, v. ALMA P. GUERIN, Appellant.

697

Darling, Shattuck & Edmonds, Douglas L. Edmonds and Donald K. Hall for Appellant.

Maury, Larsen & Hunt and John S. Hunt for Respondent.

RICHARDS, J. pro tem.*—The defendant, Alma P. Guerin, appeals from a judgment which awards to her husband's executor an undivided one-half interest in all property, real or personal, held or owned by decedent or by the appellant or by both during the lifetime of the decedent. The decree includes several parcels of real property vested of record in the appellant's name, but it excepts the sum of $20,000 received by her from the liquidation of certain government bonds and from the proceeds of a life insurance policy. Appellant is declared to be a trustee of all of such property for the benefit of the executor and the executor is given judgment against appellant for $102,342.89, representing the decedent's share of the proceeds of properties sold by appellant before and after the death of the decedent. The judgment awards also to the executor an annuity contract purchased by appellant from defendant The Prudential Insurance Company of Amer-

---

*Assigned by Chairman of Judicial Council.

ica, and decrees that said annuity contract be transferred to the executor and that any cash derived therefrom be credited against the money judgment, after charging appellant with certain deductions.

Paul J. Guerin, the decedent, and Alma P. Guerin were married in 1910, moved to California in 1913 and lived here continuously until his death in 1952. Marjorie, their daughter, was born in 1914, and Bruce, the executor of his father's estate, an adopted son, was born in 1919. Reference will hereafter be made to the members of the immediate Guerin family by their first names. Soon after Paul and Alma arrived in California he obtained employment as a motion picture studio technician and, except for periods during the depression, was steadily employed in that capacity and thereafter as an electrical effects technician up to 1951, at which time he was the superintendent of the electrical effects department of Republic Studios. Alma, in addition to her duties as a housewife, during their married life devoted much of her time and talent to the purchase, management and sale of real estate and, as modestly admitted in her closing brief, ''Her operations over the years show that she has very successfully analyzed the real estate market.''

The properties and their avails which are the subject matter of this action fall into two general categories; first, properties which were acquired prior to and covered by an agreement between Paul and Alma executed in 1922, and second, properties bought and sold by Alma subsequent to 1922, record title to each of which was taken in Alma's name, as a married woman.

Between 1913 and 1922, Paul and Alma purchased various parcels of real estate, title to which was taken either in their joint names or in Alma's name only. On December 22, 1922, they entered into a property settlement agreement specifically describing the properties then owned by them. They agreed therein that all of such properties were community property regardless of the manner in which title was vested and that all of such property then owned by them, whether described or not, was by said agreement divided equally so that one-half would become the separate property of each and that all of said property, together with the rents, issues, profits and increase thereof, and the proceeds of any sale or other disposition thereof, then and thereafter should be owned in undivided one-half interests. The agreement further provided that it was not to affect the community character of property

thereafter acquired by Paul or Alma by or through the earnings of either of them.

Included in the first category of properties and avails involved in this action and covered by the 1922 agreement, were 10 parcels of real property, several of which were lost by condemnation or foreclosure during the depression and two of which were sold. The two remaining parcels described in that agreement constitute "the ranch property," which originally consisted of approximately 19 acres. In 1932 Alma conveyed these two parcels by a deed of gift to their minor daughter, Marjorie, who was then approximately 18 years of age, and in 1933 Paul and Alma executed and delivered to Marjorie a quitclaim deed covering the same property. The same year approximately four acres were lost through foreclosure and in 1936, Marjorie, who was then of age, reconveyed the remaining 15 acres of the ranch property to Alma, as her separate property, by a gift deed, and in 1938 Marjorie executed and delivered grant deeds to the same property naming Alma as grantee. In 1947, Alma conveyed certain small portions of the ranch property to Marjorie and Bruce by gift deeds and in 1949 and 1950 she conveyed to herself and to Paul, as joint tenants, approximately three acres of the ranch property upon which their residence was located and which is referred to as the "home place." In February 1950 Alma sold the "ranch property," except the "home place," for $105,000, and from the sale she received $9,548.56 in cash and a note payable to herself for $90,000, secured by deed of trust.

The second category of properties involved in this proceeding consists of properties purchased by Alma after the 1922 agreement, title to which she took in her own name, as a married woman. In 1940, she purchased a lot on Victory Boulevard for $500 cash and a year later she agreed to purchase the adjacent lot for $250 and made a $50 down payment thereon. Between 1940 and 1945 she improved these lots with remodeled and new buildings financed through loans made in her own name only. The income from these properties was used to pay off the improvement loans and, together with the money which she received from an interest in the operation of a beauty shop in one of the stores, was used to make down payments on several other properties, title to each of which she took in her own name and which was still vested in her name at the time of Paul's death.

On November 11, 1951, after a serious quarrel with Alma,

Paul went to Louisiana to visit his mother and for treatment of a lung cancer. He returned to Los Angeles about March 14, 1952, but did not see Alma until two days before his death. On March 12, 1952, Alma arranged to discount the ranch property $90,000 note and trust deed for $72,500, and on March 20, 1952, she received therefrom the net sum of $72,327 which she immediately sent to Marjorie in Michigan, which Marjorie thereafter returned to Alma. On March 15, 1952, Alma made application to purchase the annuity contract, payment for which was made by her on March 20, 1952. On March 17, 1952, while the sale of the trust deed was pending, Paul filed an action against Alma for separate maintenance and for the recovery of his share of the community property, and he died on March 29, 1952, two days after a hearing on an order to show cause for his temporary support. Alma had sold one of the Victory Boulevard lots in 1951, and in October, 1952, she discounted and sold for $18,930 the $28,315 purchase money note and trust deed which she had received as part of the purchase price and in the same month she sold the other Victory Boulevard lot for $20,000, receiving a $15,800 purchase money note and trust deed payable to her which she discounted on December 1, 1952, for $12,433.75. The latter part of 1952, Alma sold the "home place" for $22,500 from which she received net cash of approximately $15,000, and shortly thereafter she moved to Arizona, taking with her in the form of cash and cashier's checks the unexpended proceeds from the aforementioned sales of real estate and discounted notes and trust deeds. She invested some of this money in real estate in Arizona and instead of depositing the remainder, kept the cashier's checks at her home in Arizona.

The net cash received by Alma from the sales of the ranch property, the home place, and the two Victory Boulevard lots was approximately $173,000. Paul's inventoried estate was appraised at $2,228.75.

The extensive findings of fact may be summarized as follows:

Paul and Alma came to California in 1913 with little or no property and neither of them had any separate property, and all of the property accumulated by Paul and Alma acquired during their marriage as a result of their earnings was community property and in some instances the separate property of Paul;

That Alma undertook to and did manage and control all

of the property, including the community and separate interest of Paul therein. That Paul reposed trust and confidence in Alma and permitted her to manage and control their properties for their joint benefit and that she used her position of trust and confidence to gain an unfair advantage over him and appropriated their community property and his separate property to her own use and benefit and assumed complete dominion and control over it and gained apparent title thereto. That on November 11, 1951, Alma for the first time claimed the entire community and separate estate of Paul as her separate property and refused to deliver any part of it to him;

That Alma held certain properties in her own name or in her name and Paul's as joint tenants and that all of such properties since their date of acquisition were either community property or that each owned an undivided half interest therein;

That after their separation and before his death she discounted the ranch property note and trust deed and with part of the proceeds she purchased the $60,000 Prudential annuity contract and appropriated the balance of $12,500 to her own use; that the purchase of the annuity contract was to evade Paul's claims and that the contract is part of the community estate;

That Alma left California in January 1953 with substantial amounts derived from the sales of certain properties in which Paul owned a half interest and that this was done by Alma to evade and escape the claims of the executor;

That Paul's share of the proceeds from the sales of properties in which Paul owned a one-half interest exceeds the amount of money in the hands of Prudential and is beyond the reach of the court, and as compensation *pro tanto* for the money removed from California by Alma, the entire annuity contract of Prudential was awarded to Paul's estate;

That the monies received by Alma from the sale of government bonds purchased by Paul "payable on death" to Alma and the proceeds of a policy of insurance on Paul's life payable to Alma were her separate property;

That Paul was the owner of an undivided one-half interest in the several properties vested in Alma's name and described in the findings; that he was the owner of a one-half interest in the avails derived from the sale of the Victory Boulevard properties and the ranch property and that the home place held in joint tenancy was in fact community property and that his

704

estate was the owner of one-half of the proceeds derived from the sale thereof.

As a principal ground for reversal, defendant urges the insufficiency of the evidence to sustain the trial court's findings of Paul's community and separate property ownership in the real properties and avails from sales of real property, record title to which was in Alma's name only. ██ "The appellate court must accept as established all the facts and inferences favorable to respondent which find substantial support in the evidence." (*New* v. *New*, 148 Cal.App.2d 372, 383 [306 P.2d 987].) "Such contention requires defendants to demonstrate that there is no substantial evidence to support the challenged findings. ██ ██ As was stated in the oft-cited case of *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, at page 429 [45 P.2d 183]: '. . . the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' which will support the findings, and when 'two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (See, also, *Raggio* v. *Mallory*, 10 Cal.2d 723, 725 [76 P.2d 660]; *Fischer* v. *Keen*, 43 Cal.App.2d 244, 248 [110 P.2d 693]; *Laherty* v. *Connell*, 64 Cal.App.2d 355, 357 [148 P.2d 895]; *Wuest* v. *Wuest*, 72 Cal.App.2d 101, 104 [164 P.2d 32].)" (*Nichols* v. *Mitchell*, 32 Cal.2d 598, 600 [197 P.2d 550].)

Alma first contends that as to the properties she purchased in her own name subsequent to the 1922 agreement, the evidence is insufficient to overcome the presumption of Civil Code, section 164, which provides, in part, that "whenever any real or personal property . . . is acquired by a married woman by an instrument in writing, the presumption is that the same is her separate property." ██ However, "such presumption is a disputable one, in the form of evidence, and may be controverted by other evidence, direct or indirect (*Stafford* v. *Martinoni*, 192 Cal. 724 [221 P. 919]); and whether or not it is so controverted is a question of fact for the trial court, its conclusions, unless manifestly without sufficient support in the evidence, being conclusive on appeal." (*Goucher* v. *Goucher*, 82 Cal.App. 449, 457-458 [255 P. 892]; see also *Nichols* v. *Mitchell, supra,* at p. 605.)

From the record before us it appears that Paul and Alma lived a harmonious married life until shortly before his death; that he was deeply immersed in his own work as a studio

electrician and electrical effects expert, and that she had a special talent in dealing with real estate; that in the first eight years of their life in California they had acquired 10 parcels of real estate, vested partly in joint tenancy and partly in Alma's name. In 1922 they entered into the written agreement previously adverted to which not only settled their respective rights with respect to properties either or both then owned regardless of the manner in which title was vested, but provided in addition that all subsequent properties acquired by or through the earnings of either of them would be community property. There is no contention by appellant that this agreement was at any time thereafter revoked, rescinded, or amended by any express agreement.

We are of the opinion that the 1922 property settlement agreement furnishes substantial evidence to overcome the presumption of Alma's separate interest in properties acquired in her own name. It appears from this agreement that even before 1922, she had purchased property in her name as well as in their joint names and that the purpose of the agreement was to settle any dispute of their respective interests in properties then held in their joint names or Alma's name alone and to prevent any subsequent dispute as to the community character of properties thereafter acquired by either of them.

At the trial Alma admitted that she and Paul discussed sales of the properties and that she handled all of the real estate transactions. Paul's brother, Alphonse, testified that he overheard frequent discussions between Paul and Alma about real estate and her handling all their business affairs; there was the testimony of Bruce, their son, that he heard many discussions between his father and mother relating to the handling of property and that his mother stated many times in Paul's presence that when it came to electricity and the studios Paul was a genius, but that he had no business sense whatsoever, and if she wanted to make a move she would have to be bothering him at the studio or wait for him to come home and that it was much easier if she just handled the whole thing. Mary Guerin, Bruce's wife, testified that subsequent to 1947 Alma told her that Paul "didn't know anything about real estate and it was a lot easier for her to conduct all the business herself because she was the one who had known all about it, that she was a real estate broker and she was the one to do the business." Florence Guerin, Paul's

sister-in-law, testified that shortly before the sale of the ranch property she overheard a conversation between her husband and Alma relative to the property standing in Alma's name, in which Alma said ''the property was in her name to facilitate transfer of property. She said Paul was too dumb to handle business so she took care of it herself.''

Additionally, Alma's precipitous liquidation of some of the properties standing in her name and the discounting of the ranch property purchase money note and trust deed upon the filing of the separate maintenance action by Paul and the various means by which she attempted to place the cash proceeds beyond the reach of the executor of Paul's estate are all inconsistent with a bona fide claim of her separate property ownership of the properties and their avails.

Appellant points to no affirmative testimony in support of her separate property interest in the post-1922 properties, but she does allude to a deed executed by Paul to her in 1924 reciting that it was for the purpose of establishing her separate interest in the property described. However it appears that in fact this deed related to a property covered by the 1922 agreement. She lays stress on evidence of their separate dealings in certain matters; their separate bank accounts and their sharing of household and other expenses as establishing a relinquishment by mutual consent, each to the other, of any community property interest in real and personal property acquired by either after 1922. Her separate ownership on this thesis is quite incompatible with her testimony that everything she had came initially from a gift from her mother; from a gift of the beauty shop equipment (after assuming all the previous owner's debts in relation thereto); from a gift of the Ramsdell lot; and from loans made in her own name.

It was the province of the trial court to weigh and consider the relation of the parties with respect to the manner of acquisition and handling of all of the real property acquired after 1922, and to weigh the presumption in favor of Alma against the provisions of the 1922 agreement and the inferences fairly deducible therefrom and other evidence, and ''[a] determination by a trial court that the presumption has been rebutted is conclusive on a reviewing court unless it is manifestly without support of the evidence''. (*DeBoer* v. *DeBoer,* 111 Cal.App.2d 500, 505 [244 P.2d 953]). ''The true situation in rebuttal of the presumption created by section 164 of the Civil Code, as to the separate character of property standing

in the name of the wife, 'can be shown by circumstantial, as well as direct, evidence and the inferences to be drawn from the evidence are for the trier of the facts to determine so long as those inferences find reasonable support in the evidence given.' (*Williamson* v. *Kinney, supra,* 52 Cal.App.2d 98, 102.) As was said in *Estate of Kane,* 80 Cal.App.2d 256, at page 266 [181 P.2d 751] : '. . . findings on community property interest are invariably accepted if there is some evidence to sustain the finding,' and 'to prevail' against them, 'appellant must show that there is no other inference, as a matter of law, than that the disputed . . . property was the separate property of [the wife].' '' (*Nichols* v. *Mitchell, supra,* p. 609.)

From the foregoing review of the record, we cannot say that appellant has established there was no substantial evidence to overcome the statutory presumption of Alma's separate property ownership of the properties acquired in her name after 1922.

■ As another ground for claimed separateness of property and avails standing in her name, appellant contends that the Victory Boulevard properties, which were ultimately sold for approximately $52,000 and the income from which, prior to their sale, was used to purchase other properties, stemmed from a $750 cash gift made to her by her mother in 1940 and that therefore all of these properties and the rents, issues, and profits therefrom were her separate property under Civil Code, section 162. The only evidence in support of this contention was Alma's own testimony that in 1940 she received $750 in currency from her mother, $550 of which she used to buy one of the Victory Buolevard lots and to make the down payment on the other. However, Alma admitted that her mother was elderly and unemployed at that time and that she had spent several thousand dollars supporting her mother over a period of several years. The trial court's oral decision aptly summarizes the evidence as to this purported gift, as follows: ''Whether or not she ever received $750 from her mother the Court is not certain. If she did receive it, the Court finds that it was a partial repayment of the money spent by Alma P. Guerin and Paul J. Guerin in supporting her mother for many years over and above the funds she received from County Relief. She was on County Relief at the time this purported gift was made. Alma P. Guerin testified in support of that that the house in which her mother lived was in her (Alma's) name and after her mother's death Alma P.

Guerin sold it for her keep." There is evidence in the record that Paul and Alma were in receipt of substantial sums of money in 1940 and the court was not obliged to accept Alma's testimony as to the purported gift, and the specific finding of the court that at no time did Alma receive a gift from her mother is amply supported by the evidence and the inferences fairly deducible therefrom.

■ Four of the parcels standing in Alma's name, a one-half interest in each of which is awarded to her by the judgment, were, according to Alma's testimony, purchased from the proceeds which she received in 1946 from the sale of the so-called Ramsdell property which she contends was a gift to her. The record is uncertain as to the date of purchase of this property although it appears that the purchase was not later than 1924, and whereas there is no direct evidence as to the source of the purchase money, it does appear that Paul and Alma sold one of the properties included in the 1922 agreement on October 11, 1923, for approximately $3,500 and the proceeds were deposited in Alma's bank account. In 1928, Alma mortgaged the Ramsdell lot for $1,000 and this loan was never paid; 10 years later she received a satisfaction of the mortgage from the distribution of the mortgagee's estate, the note having been appraised at "no value." The court's finding that the Ramsdell property was purchased with community funds is thus sustained by the record and hence any properties purchased by Alma with the proceeds from the sale thereof were likewise properly found to be community property. (*Boyd* v. *Oser*, 23 Cal.2d 613, 621 [145 P.2d 312].)

A further contention is made by appellant that the purchase and improvement of several of the properties acquired after 1922 were upon loan transactions by Alma in her name and are therefore her separate property. ■ It is well settled that proceeds from a loan made to a spouse on the credit of his or her separate property are the separate property of that spouse (*Estate of Ellis*, 203 Cal. 414, 416 [264 P. 743]; *Estate of Abdale*, 28 Cal.2d 587, 592 [170 P.2d 918]). However, the application of this principle depends upon the hypothecated property being in fact the separate property of the borrowing spouse and does not turn on the mere record title thereof in the borrowing spouse. Here the court found that the various properties upon which Alma made loans were not her separate property. ■ Another equally established principle is that money borrowed by a married woman

to invest or improve real property during marriage is community property unless it is borrowed on her separate property. (*Moulton* v. *Moulton,* 182 Cal. 185, 189 [187 P. 421].)

Turning now to the properties and avails covered by the 1922 agreement, it is Alma's contention that notwithstanding the express provisions of that agreement, under which each acquired an undivided half interest in the properties therein described, the court erred in finding that the plaintiff was entitled to a one-half interest in the proceeds which Alma received from the sale of the ranch property. Her contention that this was her separate property when it was sold in 1950 is based upon Marjorie's reconveyance thereof by gift deed to Alma in 1936 and Marjorie's subsequent grant deed thereof to Alma "as her separate property" in 1938. The court found that the conveyances to Marjorie were made solely because of fear of loss due to threatened foreclosure; that Marjorie at all times held title to the property as trustee for the benefit of Paul and Alma and that Marjorie's reconveyances in 1936 and 1938 to Alma were not intended to vest title in Alma as her separate property. The record shows that at the time this property was deeded to their minor daughter it was subject to a past-due note and trust deed and Paul and Alma were trying to arrange for a new loan to prevent foreclosure, from which it is reasonably inferable that no gift of the property to Marjorie was intended by either Paul or Alma and that Marjorie's subsequent reconveyance of the property to Alma as her separate property did not extinguish Paul's rights to an undivided half interest therein under the 1922 agreement.

The remaining property which falls into the first classification of properties owned prior to 1922 is the "home place." As previously pointed out, this was part of the ranch property which was conveyed to Marjorie and then back to Alma. In 1949 and 1950 Alma conveyed to Paul and Alma, as joint tenants, approximately 2.9 acres of the ranch property, upon which their home was located and which is referred to as the "home place." Part of this property was registered land and Paul and Alma executed a transferee's affidavit that the property was being acquired by them as joint tenants. Acceptance of a joint tenancy deed creates a presumption that the title is vested in accordance therewith. (*Veronin* v. *Veronin,* 131 Cal.App.2d 298 [280 P.2d 173]; *Schindler* v. *Schindler,* 126 Cal.App.2d 597 [272 P.2d 566]; *Socol* v. *King,* 36 Cal.2d 342 [233 P.2d 627].) The presumption

arising from the form of the deed may not be rebutted solely by evidence as to the source of funds used to purchase the property. (*Gudelj* v. *Gudelj*, 41 Cal.2d 202, 212 [259 P.2d 656].) ▮ It may be controverted by testimony indicating the intention, understanding and agreement of the parties (*Socol* v. *King, supra*, p. 345; *Schindler* v. *Schindler, supra*, p. 602), but the undisclosed intention of one party with respect to the effect of the conveyance will not suffice to establish the real nature of the ownership. (*Socol* v. *King, supra*, p. 346.) ▮ If one spouse transfers community property into joint tenancy without the consent or participation of the other, the nonparticipating spouse may show the absence of his or her intent to accept such conveyance, but if the latter consents to or participates in the conveyance by any act in writing, the legal effect of such conveyance in joint tenancy may be rebutted only by sufficient proof of a mutual understanding that the property was not to be held in accordance with the presumption arising from the instrument. (*Schindler* v. *Schindler, supra*, p. 604.) Following Paul's death Alma sold the home place for $22,000. The court found that Paul did not intend to convert the home place into joint tenancy and that said property was in fact community property and that he was entitled to recover $11,000 from Alma as half the amount she received, and this amount was included in the money judgment against her. ▮ By reason of Paul's active participation in the creation and acceptance of the joint tenancy, his secret intent, in the absence of a mutual understanding that the property was to be community property, cannot prevail over the presumption created by the deed. There is therefore no substantial evidence to sustain the trial court's finding that the home place was the community property of Paul and Alma at the time of his death.

With the one exception just noted, it is manifest from the entire record that appellant has not made the showing required for a successful challenge of the trial court's findings as to the community and separate character of the respective properties involved and of their avails.

Appellant contends that the trial court erred in admitting certain declarations of Paul, not made within the presence of Alma, as to his intent in permitting property to be taken in Alma's name. That such oral and written declarations were hearsay is not disputed. ▮ However, under well-recognized exceptions to the hearsay rule, such declarations, made after the acquisition of record title by Alma, were prop-

erly admissible on the issue of a claimed intent of Paul to relinquish to Alma any community property interest he had in various properties. (*Hansen* v. *Bear Film Co., Inc.*, 28 Cal. 2d 154, 173 [168 P.2d 946]; *Whitlow* v. *Durst*, 20 Cal.2d 523, 524 [127 P.2d 530].) Relying on *People* v. *One 1948 Chevrolet Coupe*, 45 Cal.2d 613 [290 P.2d 538], appellant contends that hearsay declarations, to be admissible, must have been made at a time of close proximity to the act of declarant to which they relate. We do not construe *People* v. *One 1948 Chevrolet Coupe* as delimiting the interval of time between the act and the declaration. It is to be remembered that Paul's declarations dealt not with a single, isolated transaction but with a series of transactions, some not far removed in time from the date of his declarations.

Appellant finally claims error in the admission into evidence of the written findings of a court commissioner following a hearing on an order to show cause in the separate maintenance action filed by Paul against Alma. Such an interlocutory order has no finality and is obviously not res judicata as to any matters determined. Appellant has not pointed out any prejudicial statement contained in the commissioner's order and we can find none. The order made no finding as to the ownership of property and expressly stated that the nature of the property standing in Alma's name was an issue in the action. Certainly no prejudice resulted from the admission of that evidence. In any event, the court stated in its oral decision that the statement in the preliminary order that Alma had disposed of trust deeds for the purpose of putting the property beyond Paul's reach was not binding on the court, but that it would make a similar finding based on independent evidence received in the trial.

In view of our determination as to the proceeds from the sale of the joint tenancy "home place," little need be said as to appellant's argument on inconsistency of the findings except to note the court did not find, as asserted by appellant, that the annuity contract was community property but found that it was part of the community estate of Paul and Alma and that each owned an undivided one-half interest in the note and trust deed which was discounted by Alma to purchase the annuity.

Inasmuch as we have determined that the trial court's findings are sustained except as to the "home place" and the evidence is full and complete with respect thereto, no good reason appears why the case should be tried again. By

California Constitution, article VI, section 4¾, and Code of Civil Procedure, section 956a, this court may make findings of fact contrary, or in addition, to those made by the trial court based on evidence adduced before the trial court (*Bacon* v. *Bacon*, 21 Cal.App.2d 540, 547 [69 P.2d 884]) and in accordance with the authority thus given us it is ordered:

That finding Number XI, subparagraph (5), be amended to read as follows:

"(5) As to the property described under Parcel 6 in said paragraph XV of the Second Amended and Supplemental Complaint, the Court finds that said property consisted of 2.8986 acres and that said property was placed in the names of Paul J. Guerin and Alma P. Guerin, husband and wife as joint tenants, on the 29th day of November, 1949; finds that said property was in truth and in fact the joint tenancy property and not the community property of the parties, and that it was intended by the decedent Paul J. Guerin that the same be owned and held in joint tenancy; finds that upon the death of Paul J. Guerin, the defendant Alma P. Guerin became the owner of said property; finds that defendant Alma P. Guerin sold said property subsequent to the death of said Paul J. Guerin; finds that defendant Alma P. Guerin received the sum of $22,000 as consideration for said sale and that plaintiff as Executor of said estate is not entitled to any part of said sum."

It is further ordered that the conclusions of law be amended as follows:

That conclusion I be amended by adding thereto the following: "except the property referred to in paragraph XI sub-paragraph (5) of the findings herein."

That conclusion III be amended by striking therefrom the words: "Sales price of certain real property standing in the name of Paul J. Guerin and Alma P. Guerin, husband and wife as joint tenants, $22,000.00." That said conclusion be amended by striking therefrom the word: "Total" and the figure: "$173,462.56" and that the figure: "$86,731.28" be stricken and in lieu thereof there inserted the figure: "$75,731.28."

That conclusion IV be amended by striking therefrom the figure: "$86,731.28" and by inserting in lieu thereof the figure: "$75,731.28" and that said conclusion be amended by striking therefrom the figure: "$102,342.89" and by inserting in lieu thereof the figure: "$89,362.91."

That the judgment entered herein be modified by adding to paragraph (1) thereof, the following: "and the sum of $22,000 derived by the sale of certain real property owned by Paul J. Guerin and Alma P. Guerin, as joint tenants." That said judgment be modified by striking from paragraph (2)(a) thereof, the figure: "$86,731.28" and inserting in lieu thereof, the figure: "$75,731.28" and by striking from said paragraph, the figure: "$102,342.89" and inserting in lieu thereof, the figure: "$89,362.91" and as so modified, is affirmed, the combined taxable costs on appeal of the appellant and of the respondent shall be apportioned in such manner that appellant shall bear 75 per cent of such combined costs and respondent 25 per cent thereof.

Moore, P. J., and Fox, J., concurred.

A petition for a rehearing was denied August 15, 1957, and appellant's petition for a hearing by the Supreme Court was denied September 18, 1957. Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.