[Civ. No. 25282. Second Dist., Div. One. Aug. 8, 1961.]

Estate of PAUL J. GUERIN, Deceased. MARJORIE LUD-
 WICKI, Appellant, v. BRUCE GUERIN, Individually
 and as Executor, etc., et al., Respondents.

Everett F. Beesley and Maurice Gordon for Appellant.

Maury, Larsen & Hunt, John S. Hunt, George R. Maury and Steiner A. Larsen for Respondents.

LILLIE, J.—This is another chapter in the protracted litigation involving the estate of decedent Paul J. Guerin (*Guerin* v. *Guerin,* 152 Cal.App.2d 696 [313 P.2d 902], and *Ludwicki* v. *Guerin,* *(Cal.App.) [15 Cal.Rptr. 506] this day decided). Two matters are presented for review. The first is an appeal from an adverse judgment on Marjorie's petition,

*A hearing was granted by the Supreme Court on October 5, 1961. The final opinion of that court is reported in 57 Cal.2d —— [17 Cal. Rptr. 823, 367 P.2d 415].

as a pretermitted heir, to determine heirship—specifically, the extent of her interest, if any, in her father's estate; said petition was heard as a companion matter to *Ludwicki* v. *Guerin, supra.* She has also appealed from an order of another judge which approved the first account current and allowed statutory and extraordinary commissions and fees claimed by the executor and his attorneys.

Marjorie's petition, which met the time requirements prescribed by the governing statute (Prob. Code, § 1080), alleged that the deceased by his last will, executed in 1952, bequeathed and devised 45 per cent of his estate to respondent Bruce Guerin, another 45 per cent to his brother Alphonse, and the remaining 10 per cent to his mother, Eva; it was further alleged that no provision had therein been made for appellant, the daughter of deceased. Objections were filed by respondent, said objections including the principal claim that Paul's estate consisted entirely of community property; therefore, under our laws of succession, she would not have succeeded to any portion of her father's estate had he died intestate.

The trial court had before it the opinion of *Guerin* v. *Guerin, supra,* and it was stipulated (although judicial notice could have been taken thereof) that the court could consider the facts set forth in that opinion. It was found that all of the property left by the decedent "was the community property of himself and his wife, Alma P. Guerin," from which the conclusion of law was drawn that Marjorie, although a pretermitted heir, was not entitled to any part of the estate.

Upon the joinder of issues in a proceeding of this kind, the trial court is required to "determine who are the heirs of the decedent or entitled to distribution of the estate and shall specify their interests." (Prob. Code, § 1081.) It is not disputed that Marjorie is a pretermitted child, and in such capacity she "succeeds to the same share in the estate of the testator as if he had died intestate" (Prob. Code, § 90); in the event of such intestacy, of course, an heir's interest in the intestate's estate must be determined by our statutes of succession, depending on the character of the property involved. Relating to succession to community property, section 201 of the Probate Code provides: "Upon the death of either husband or wife, one-half of the community property belongs to the surviving spouse; the other half is subject to the testamentary disposition of the decedent, and in the absence thereof goes to the surviving spouse . . ." Relating to succession to separate property, section 221 of the Probate Code in pertinent

part provides: ". . . If the decedent leaves a surviving spouse, and more than one child living . . ., the estate goes one-third to the surviving spouse and the remainder in equal shares to his children . . ."

Under the governing provisions of section 221, *supra,* Marjorie would be entitled to take one-third of her father's estate only to the extent that such estate consisted of separate property, for she "is an heir only as to property as to which it does appear" (*Estate of Simonton,* 183 Cal. 53, 60 [190 P. 442]); see also *Estate of Rattray,* 13 Cal.2d 702, 706 [91 P.2d 1042]. Accordingly, the burden was on appellant of producing "clear and satisfactory proof that the property was the separate property of decedent" (*Estate of Duncan,* 9 Cal. 2d 207, 217 [70 P.2d 174]), since respondent was entitled to rely on the presumption that all property acquired after marriage (with certain exceptions not here urged) is community property (*Wilson* v. *Wilson,* 76 Cal.App.2d 119, 125 [172 P.2d 568]); and this presumption, it is declared, "has greater force in cases where the marriage has been a long-continued relation" (*Estate of Duncan, supra,* p. 217). Another presumption is here applicable: "When separate property is intermingled with community funds, the respective properties or funds remain unchanged in character so long as they can be clearly ascertained [citation]; but the presumption in favor of community property (Civ. Code, § 164) applies to commingled property [citation] so that the burden of proof rests with the party claiming the property to be separate." (*Estate of McGee,* 168 Cal.App.2d 670, 677 [336 P.2d 622].)

 Save for one of respondent's counsel, who was called by appellant as respondent's agent to construe certain findings drafted by him in *Guerin* v. *Guerin,* appellant produced no testimony to support her claims; instead, she relied entirely on the facts set forth in that opinion, the findings therein which were received by reference, and a compromise agreement entered into following judgment in the plenary action. (*Guerin* v. *Guerin.*) Although the opinion states (152 Cal.App.2d 696, 699) that the appellant in that litigation "is declared to be a trustee of all of such property [several parcels of realty] for the benefit of the executor," Finding Number 8 in the plenary action declares that, "It is true that all the real properties so described are now and at all times since the date of their acquisition either have been the community property of said Alma B. Guerin and the said Paul J. Guerin, or that each of said parties own an undivided interest

therein as his or her separate property." Appellant's counsel called the court's attention to this seeming discrepancy, complaining that the finding was in effect ambiguous—"It isn't precise enough. Now if the Judgment point out . . . rather if the findings, I mean, pointed out which properties . . . THE COURT: Well, that's your job. You've got to prove that. MR. GORDON: Yes, and we think we have done so by this . . . THE COURT: Well, I'll tell you unqualifiedly you haven't done so . . . I don't know one piece of property from the other. Haven't the faintest idea. MR. GORDON: Well, I appreciate your Honor's frankness in that and I will ask permission to reopen so that we may put some evidence on concerning it." Mr. Hunt, one of respondent's counsel, was then called. While he was on the stand, the following colloquy occurred: "THE COURT (addressing appellant's counsel) : . . . if you want me to divide, set up any portion of this property that you claim that your client is entitled to, how can I do it unless you prove it. MR. GORDON: Perhaps I didn't get your Honor's point. Is it your Honor's position that we have a burden of showing what specific items of property in the estate today came from separate property? THE COURT: Well, the whole estate is all commingled with separate and community properties. MR. GORDON: That's right. THE COURT: And I certainly wouldn't make any order here that your client was entitled to one-third of a certain piece of property not knowing whether it is for separate or community. MR. GORDON: We are not asking your Honor to. THE COURT: Then what are you asking me to do? MR. GORDON: We are asking only this, your Honor, to declare that the witness, or that Marjorie Ludwicki is entitled to a certain percentage of the assets of the Estate, not a specific piece of property. THE COURT: My dear man, how can I do that unless you prove what the property is? How can I do it? MR. GORDON: Your Honor, we are not required to prove the impossible . . ."

As a result of the foregoing colloquy, although appellant originally had claimed "one-half of the properties and assets of the estate," her counsel centered his attention on the money judgment, reduced upon appeal in the plenary action to $75,-731.28; he argued below, and again before this court, that since the trial court's award of that judgment consisted in part of some of the proceeds of the sale of the so-called "ranch property" described in the 1922 agreement, she is entitled to share equally in that judgment without any further proof. But, as respondent's counsel points out, what part? As a

matter of fact, the trial court in the plenary action found that the $60,000 annuity, purchased by Alma in part with the proceeds of that sale, was a part of the "community estate" of the parties; thus, it was found that "after [the parties'] separation and before [Paul's] death she discounted the ranch property note and with part of the proceeds she purchased the $60,000 Prudential annuity contract and appropriated the balance of $12,500 to her own use; that the purchase of the annuity contract was to evade Paul's claims and that the contract is part of the community estate." Interestingly enough, as respondent's counsel also points out, there was such an intermingling of the proceeds of the sale in question that nobody, including the trial judge in the plenary action, was able to trace them into any identifiable form except the $60,000 which was used to purchase the annuity. Mrs. Guerin, of course, could have aided her daughter in tracing the source of the funds thus commingled; she was never called, her unavailability as a witness never explained and an adverse inference could properly have been drawn.

██ Where it is "impossible" to trace the source of specific property, the presumption declared in section 164 of the Civil Code is controlling (*Gudelj* v. *Gudelj*, 41 Cal.2d 202, 210 [259 P.2d 656]); furthermore, since "clear and satisfactory" proof is required in actions of this character, the *quantum* of proof is generally a matter for the trial court whose determination is conclusive on appeal if supported by sufficient evidence or if based on evidence that is subject to different inferences. (*Estate of Ades*, 81 Cal.App.2d 334, 337 [184 P.2d 1].) ██ The question of tracing the nature of property is primarily factual. (*Estate of Doran*, 138 Cal.App.2d 541, 549 [292 P.2d 655].) ██ The conclusion reached by the trial court on this, appellant's major point, must accordingly be sustained.

Appellant makes two additional points, neither of which has merit. ██ First, it is contended that since Alma made a settlement with the estate of her deceased husband some considerable time after the judgment in the plenary action was affirmed, such compromise of her claims in some way constitutes an admission that certain of the assets involved here were separate property; more specifically, she executed a waiver of all interest in the estate over and above a certain amount and such overage is therefore subject to the rights of appellant as a pretermitted heir. No authority is cited for this contention. As to the portion that a pretermitted child takes,

the decedent is regarded as having died intestate, and the succession to his estate is directed by the laws of succession, and not by what was accomplished by his personal representative many years later. Second, appellant made a request for special findings (Code Civ. Proc., §§ 632 and 634); it is urged that the trial court erred in refusing such findings. Section 632 provides that, "The statement of facts found shall fairly disclose the court's determination of all issues of fact in the case." In the case at bar the trial court found that "all of the property left by the decedent was the community property of himself and his wife, Alma P. Guerin"— that, in our opinion, fairly disclosed the determination of the trial court on all issuable facts in the case; certainly no reversible error has been made manifest.

It is our conclusion, therefore, that the judgment determining appellant's interest as a pretermitted heir must be affirmed.

 We now come to the appeal from the order approving the first account current and awarding commissions and fees. Unlike the heirship proceeding, the record consists solely of a clerk's transcript.

Admittedly the sole question at issue is the size of the estate accounted for; appellant maintains that the gross estate is $113,874.04 instead of $142,922.74 as shown in the account. The difference, the sum of $29,048.70, represents disbursements by the executor as a result of certain events now to be related.

Upon affirmance of the judgment in the plenary action, the $60,000 annuity contract became part of the estate; the proceeds payable were deposited with the clerk of the federal district court upon the filing of an interpleader action in that court by the insurance company. From the payments received, the clerk pursuant to appropriate orders paid taxes and other obligations of the estate, most of which were secured by encumbrances upon the real properties held by the executor. Subsequently, and after the settlement of many disputes with Alma, the probate court approved an agreement whereby the remaining cash value of the annuity could be accepted by the executor in lieu of installment payments; this balance was paid by the insurance into the United States Registry and then into an escrow.

Upon the making of the final single fund payment, the executor became entitled to the full balance thereof, but subject to the terms of the compromise agreement previously

approved. This compromise settled all disputes with Alma, including an award to the estate of one-half interest in all parcels of real property. Also included were the release of equities of redemption after execution by the executor, the settlement of matters on appeal in the federal court, the settlement of a money judgment against Alma, the settlement of payment due on income taxes due and payable by the estate (which taxes were to be paid by Alma out of an escrow after the money was taken from the U.S. Registry and placed in escrow), and claims for a family allowance and a probate homestead by Alma.

Respondent asserts that funds collected by the federal court "were used to pay debts of the estate to prevent tax penalties and foreclosures on real estate at that time held one-half by the estate and one-half by Alma Guerin." It is also pointed out that the estate had a money judgment against Alma, and it was the responsibility of the executor to collect it from the annuity funds due on an annuity with a full value of $60,000.

We agree with the trial court that the sum in question, $29,048.70, was in fact "handled by the executor and the fact that it was restrained by an escrow is immaterial." As shown in the account $18,939.30 was used to pay estate obligations from the Federal Court Registry, while an additional $10,109.40 was expended to settle income tax liens. "All payments," the trial court properly held, "were for the benefit of the estate." In *Estate of Russell*, 23 Cal.App.2d 103, 106-107 [72 P.2d 219], it is said: "Property coming under the control of an administratrix and inventoried by her as property belonging to the estate, even though claimed adversely by another, ordinarily must be accounted for by such administratrix in the course of her administration . . . The question herein is not whether some third person got a judgment against her or against the estate, but how does she actually account for the money which was in her possession." It is settled, of course, that "the taking possession of property claimed as part of the estate is not the sole test . . . in determining 'the amount of the estate accounted for.' " (*Estate Lampman*, 15 Cal.2d 212, 216 [100 P.2d 488].)

This brings us to the next question, namely, the award of extraordinary fees to respondent's attorneys. It is, of course, axiomatic that the allowance of such fees is in the discretion of the trial court and will not be disturbed on appeal unless such discretion has been abused. (*Estate of Merritt*, 98 Cal.App.2d 70, 76 [219 P.2d 40].) As was pre-

sumed to have been done by the trial court in *Merritt,* the trial court here took into consideration the value of the property, the time occupied, the nature of the services and their necessity. A memorandum opinion, part of the record on this appeal, states in part: "It is important that attorneys be compensated justly for benefits they obtain and at the same time it is important that they not be overpaid. They asked for $60,000 for their services and while this is not an unreasonable request, the Court is of the opinion that $52,500 will compensate them for their extraordinary services . . . The estate obtained all of its assets from the services of the attorneys in the state and federal court litigation. The legal proceedings were of considerable complexity. They certainly were not simple or routine and required expert handling. The results were satisfactory. The over-all time was considerable and as a practical matter the services were rendered on a contingent basis and the attorneys would have received nothing had they not been successful."

With respect to the contingent nature of the employment, the fee fixed by the trial court is less than 50 per cent of the value of the estate as computed by appellant ($113,874.04); a 40 per cent fee was approved in *Houge* v. *Ford,* 44 Cal.2d 706-709 [285 P.2d 257], and a 50 per cent fee approved in *Estate of Raphael,* 103 Cal.App.2d 792, 796 [230 P.2d 436]. In the case last cited the court declared: "A contingent fee contract, since it involves a gamble on the result, may properly provide for a larger compensation than would otherwise be reasonable," thereafter listing numerous decisions, in California and elsewhere, where contingent fees of 50 per cent were upheld. The sum awarded respondent's attorneys is considerably less than 50 per cent of the estate's gross value; it is certainly not unreasonable as a matter of law, and the award will not be disturbed.

The court also awarded $2,500 to the executor for extraordinary services. Appellant has little, if anything, to say about the court's action in this regard. The same is true with respect to statutory commissions and fees. As noted earlier, and as stated by appellant, the "decisive question involved relates to the amount of the estate 'accounted for' by the executor." Our determination of that question has already been rendered.

Subsidiary to the assignment that the executor's account was erroneously approved, appellant challenges the approval by the court of a creditor's claim of Mr. Maury, one of the

decedent's attorneys, for $1,500 as and for legal services rendered the decedent in the latter's separate maintenance action against Alma. The claim was allowed after Mr. Maury testified and was cross-examined. The basic difficulty with appellant's criticism of the claim's allowance is that the record on appeal consists, as previously noted, solely of a clerk's transcript; that being so, the asserted error of the trial court, or facts necessary to establish such error, must be affirmatively shown. ▮▮▮▮ ''On an appeal on the judgment roll alone, where a finding is made on the subject matter, it will be presumed that there was received into the record, evidence sufficient to support it.'' (*Ferl* v. *Ferl*, 135 Cal.App. 2d 458, 462-463 [287 P.2d 514].) The assignment of error is without merit.

As in the related appeal pertaining to the determination of heirship, appellant also requested special findings; their refusal, it is asserted, was error. We are not persuaded that the point is well taken, principally because it would require a reporter's transcript to determine whether such request was properly denied.

We conclude, for the reasons stated, that the order approving the account current and the award therein of commissions and fees must be upheld.

The judgment and order appealed from are affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 5, 1961.